ROBINSON v. DETROIT & C. STEAM NAV. CO. HURLEY et al. v. THE CITY OF MACKINAW.   HURLEY v. DETROIT & C. STEAM NAV. CO.

(Circuit Court of Appeals, Sixth Circuit.   April 14, 1896.)

Nos. 314, 315, and 316.

1. ADMIRALTY—COLLISION—OVERTAKING VESSEL.

The steamer M. was proceeding slowly up the Detroit river, near the Canadian side, on a dark and rainy, but not foggy, night, with the tug W. made fast to her starboard quarter. The steamer C. was also proceeding up the river, astern of the M., and at a much greater speed. As the C. approached the M., intending to pass the latter on the starboard hand, between her and the Canadian shore, the captain of the C. thought he saw indications that the M. intended to round to, in the direction of the Canadian shore; but, being in doubt, he checked the speed of his own vessel, and ported his helm, bringing her also round in the direction of the Canadian shore, but gave no signal. At this time, the tug cast off from the M., and, making a sharp turn, headed for the Canadian shore. Before the headway of the C. could be checked sufficiently, or her head turned far enough, to avoid it, she ran into the tug, seriously injuring the latter and throwing two men, one of whom was the managing owner of both the tug and the M., into the water, where they were drowned. The tug was undermanned, and had no lookout, and her captain did not see the C.; and the lookout on the C. did not distinguish the lights of the tug from those of the M., or know of the presence of the tug alongside the latter. *Held*, that the C. was in fault, both in failing to signal her intended course, as she overtook the M. and the tug, and also in porting her wheel and rounding to, in the same direction in which she supposed the M. to be turning, instead of passing under the M.'s stern to port.

2. SAME—LIABILITY OF TUG MADE FAST TO VESSEL.

*Held*, further, that the tug, which was made fast to the M., and, when cast off, took the course which the officers of the C. supposed the M. was about to take, was so far identified with the M. that it could take advantage of the fault of the C., with respect to the M., which fault was the legal cause of the collision with the tug.

3. SAME—UNDERMANNING.

*Held*, further, that the tug was also in fault in failing to have its full complement of men, and thereby failing to keep a proper lookout, and that the damages to it must be divided between the tug and the C.

4. SAME—INJURY FOR CAUSING DEATH.

An action, by libel in personam, for damages for death, under statutes like Lord Campbell's act, in force where the cause of action arises, can be entertained and carried to decree in a federal court of admiralty. The City of Norwalk, 55 Fed. 98, and The Transfer No. 4, 20 U. S. App. 570, 9 C. C. A. 521, and 61 Fed. 364, followed.

5. SAME—CONTRIBUTORY NEGLIGENCE.

In such suits, contributory negligence of the libelant is a bar to recovery. Accordingly *held*, that there could be no recovery for the death of

the owner of the tug, who must have known that the tug was short-handed, and was responsible for the negligence of her master.

6. SAME—PASSENGER.

Held, further, that as to the other person drowned, who was a mere passenger, under the law of the province of Ontario, where the accident occurred (found as a fact to be the same as the law prevailing in the federal courts), the negligence of the tug could not be imputed to him, and he was entitled to recover against the owners of the C., the owners of the tug not being parties to the proceedings before the court.

Appeals from the District Court of the United States for the Eastern District of Michigan.

These are appeals from decrees of the district court of the United States for the Eastern district of Michigan in admiralty, dismissing one libel in rem against the steamer City of Mackinaw and two libels in personam against the Detroit & Cleveland Steam Navigation Company, the owner of the steamer City of Mackinaw, for damages, arising out of a collision which occurred on the Detroit river between 10 minutes after 10 and 15 minutes after 10, central standard time, on the night of May 28, 1892, between the steamer City of Mackinaw and the steam tug Washburn, whereby the tug was considerably damaged, and John Hurley and William Robinson, who were on board the tug, were thrown into the water, and drowned. The Detroit & Cleveland Steam Navigation Company, under general admiralty rule No. 59 (which permits the claimant of any vessel proceeded against, or any respondent proceeded against in personam, in a suit for damages by collision, to bring into the cause any other vessel or person alleged to have been guilty of fault or negligence in the same collision, so that such other vessel or person shall be proceeded against in the same suit for such damages as if the vessel or person had originally been made a respondent), brought in the steam tug Washburn to answer to the claims of the representatives of the persons who were drowned. The tug Washburn, appearing, claimed the benefit of limitation of the liability provided for in sections 4283–4286 of the Revised Statutes of the United States. Due appraisement was had thereunder. The court below dismissed all the libels. The libelants in each case appeal to this court, and the three causes have been heard together upon one record.

The City of Mackinaw is a side-wheel passenger steamer, 203 feet long, hailing from Detroit, and owned, as already stated, by the Detroit & Cleveland Navigation Company, a corporation of Michigan. Her regular route was from Detroit to Mackinac Island, between which points she made semi-weekly trips. The tug Washburn was a small harbor tug, owned by John Hurley and Timothy Hurley, of Detroit. It was 53 feet 6 inches in length, and 16 feet beam, used exclusively in river and harbor towing. The propeller Majestic, the movements of which have a material bearing on the issues in the case, was a steam propeller, also owned by the Hurley brothers, 291 feet in length, with a beam of 40 feet, employed in the freighting business upon the Great Lakes. Upon the night of the collision, the propeller Majestic was on her way up the Detroit river, bound from a Lake Erie port to Chicago, coal laden. John Hurley, one of her owners, called the tug Washburn to take him out to the Majestic, to enable him to transact some business with Capt. Lawless, her master, and to transfer some tow lines. The tug transferred the lines, put Mr. Hurley on board the propeller, and then went ashore again to get the engineer of the Majestic, Thompson W. Robinson, who was waiting at Shipman's coal dock, to be taken out to the propeller. Thompson W. Robinson was the regular engineer of the Majestic, but, during an absence of a few days, had procured his brother William Robinson to take his place. The tug returned to the Majestic with Thompson Robinson, went alongside the starboard side of the Majestic, and was made fast on her starboard quarter, where she received another tow line from off the fantail of the Majestic, and waited for John Hurley and William Robinson, to take them ashore. The Washburn had a stern light burning on a

pole at a proper distance from her deck. It was referred to by some of the witnesses as a common lantern. She also had her signal lights burning brightly. The Majestic had all her lights properly placed, and among them was a stern light at a considerable distance above her upper deck, and some 20 feet above the stern light of the tug. She also had a light upon her fantail. The night was cloudy, rainy, and dark, but good for seeing lights, and between 10 minutes after 10 and 15 minutes after 10, which was the time of the collision, a breeze of about 12 miles an hour was blowing from the south. The tug came alongside the Majestic the second time when the latter was abreast of the Detroit & Milwaukee Elevator, and well over on the American side, and remained fast to her starboard until just before the time of the collision. The Washburn and Majestic proceeded under a slow check, estimated at from 2 to 4 miles an hour by the land, or from 4 to 6 miles an hour through the water, on a course about E. by S., heading for the elevator in Walkerville, on the Canadian side.

The Mackinaw left her dock at the foot of Wayne street, in Detroit, below Woodward avenue, on her way up the Detroit river, passing Woodward avenue at 6 minutes after 10, standard time, hauled out into the stream, and passed about 200 feet on the port side of the revenue cutter Fessenden, which lay 800 feet out in the stream two blocks above Woodward avenue. From this point the Mackinaw took a course of E. ½ N., and here she exchanged a two-blast signal with a steam barge coming down, passing it starboard to starboard. About the same time the master of the Mackinaw saw one-fourth of a mile ahead, and from 2 to 4 points on his port bow, some bright lights, which he supposed to be the anchor lights of vessels moored there. He soon discovered that the lights, or some of them, which afterwards proved to be those on the Majestic, were working over towards the Canadian shore. The Mackinaw was a fast vessel, and on her way up the river was going 10 miles an hour, or a little better, over the land, which is equivalent to about 12 or 13 miles an hour through the water. The courses of the two vessels converged and crossed a few hundred feet from the Canadian shore near Walkerville. The Mackinaw proceeded with unabated speed, overhauling the Majestic quite fast, and came within two lengths of her stern. The course of the Mackinaw lay directly up the river close to the Canadian shore. The course of the Majestic would have carried that vessel into the shore if unchanged. When within two lengths of the Majestic, the master of the Mackinaw became doubtful as to what the Majestic intended to do, and, judging that she was about to round to, ported his helm, and checked. The officers and the men of the Mackinaw state that they did not know of the presence of the tug on the starboard quarter of the propeller, and were unable to distinguish her lights from those of the propeller. The master of the Mackinaw intended to pass the Majestic on the starboard hand of the Majestic, between her and the Canadian shore. His doubt as to her future movements, however, and his fear lest she might round to, led him to port and check. Just about this time, the tug Washburn, with William Robinson and John Hurley aboard, cast off from the Majestic; and, for fear of suction by the big screw of the Majestic, the master of the tug rang up his engine, and moved the tug forward along the starboard side of the Majestic, from the rear gangway, until about 'midships, gradually sheering off. At that point the master checked down, and looked out from the starboard door of his pilot house up and down the river, and, seeing no vessel in either direction, put his wheel aport, swung the tug to starboard, rang up his engine, and took a course directly towards the Canadian shore. Very shortly after he had rung up his engine, he saw some colored lights. Whether they were the lights of the Mackinaw or railroad switch lights upon the shore is in dispute. Whatever the fact, they caused him to blow two whistles. Immediately after this blast, he saw the dark form of the Mackinaw bearing down on his starboard side, and then followed the collision. While the tug was engaged in freeing itself, and swinging off from the Majestic, the master of the Mackinaw, growing more anxious and doubtful concerning the situation, ordered his wheel still more aport, and stopped his engines. Just then the lookoutsman of the Mackinaw heard the exhaust of the tug. He and the captain and the mate

of the Mackinaw caught the glimmer of her green light about 75 to 100 feet off the port bow, and heard her blast of two whistles. As soon as the green light was seen, the master of the Mackinaw signaled to reverse her engines. Both vessels were swinging to starboard, and the head-reaching of the Mackinaw was sufficient to carry her bow into the starboard side of the hull of the tug through a full bunker of coal against her boiler, so as to break a plate therefrom. Her speed at the time of the collision was estimated by her officers to have been about five miles an hour. She struck the tug a point or two abaft the beam, and not at right angles. The collision threw Hurley and Robinson into the water, and, before they could be picked up, they were drowned. The tug, after it was released by the backing of the Mackinaw, its engine and machinery still being in operation, ran aground near the Canadian shore, and sank. The master of the tug caught the stem of the Mackinaw at the time of the collision, and climbed up over her bow. The rest of the crew of the vessel were saved, and taken off the tug after she went aground on the Canadian shore. The Majestic, after the tug had swung off from her, changed her course two points to port, and proceeded up the river, her officers supposing from the fact that the tug had gone towards the Canadian shore that the collision which they witnessed had not resulted in serious damage. The tug had but four men in her crew, though her papers called for five. She had no lookout. Her master acted as master, as wheelsman, and as lookout. The Mackinaw was properly manned. Her captain and mate were on the hurricane deck, near the pilot house, and she had a lookout forward on the promenade deck, "in the eyes of the ship." The captain, mate, and lookoutsman on the Mackinaw stated that they did not see the stern light on the tug at all, although they were watching the Majestic with great care. The captain of the tug states that he did not see the lights of the Mackinaw at all, but that, after he climbed over her bow, he went and found that her signal lights were burning brightly. These lights were about 28 feet above the water, in a screen 4 feet in length and 90 feet from the stem of the vessel. The officers of the Majestic state that there was smoke upon the water that night, through which the Mackinaw appeared to them off their starboard quarter. This is the testimony also of the men upon the tug. The officers and men of the Mackinaw deny that there was any smoke which could obscure their lights, because the wind was from the southeast, as they say, and was carried over their port quarter to the Canadian side. The evidence of the men on the Majestic and on the tug tended to show that the wind was from the southwest. The evidence from the Signal Service office records was conflicting, but probably the correct record showed the wind from the south at the time of the collision. The district court held that the collision arose through the gross fault of the tug in not having a proper lookout, and in running across the Mackinaw's bows without giving any notice of her presence, and acquitted the Mackinaw of fault.

John C. Shaw, for appellants.

Wells, Angel, Boynton & McMillan, F. H. Canfield, and H. D. Goulder, for appellees.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

TAFT, Circuit Judge (after stating the facts as above). Rev. St. § 4233, provides rules for preventing collisions on the water in navigation of vessels of the navy and of the mercantile marine of the United States; and, although subsequent acts have been passed which relate to the navigation by such vessels upon the high seas and in all coast waters of the United States, section 4233 is still in force as to navigation in the harbors, lakes, and inland waters of the United States, and the merchant marine of the United States

on the Detroit river are therefore governed by this section of the Revised Statutes. The North Star, 10 C. C. A. 262, 62 Fed. 71.

Rule 22 of section 4233 provides that every vessel overtaking any other vessel shall keep out of the way of the last-mentioned vessel. Rule 23 provides that where, by rule 22, one of two vessels shall keep out of the way, the other shall keep her course, subject to the qualifications of rule 24. Rule 24 provides that, in construing and obeying these rules, due regard must be had to all dangers of navigation, and to any special circumstances which may exist in any particular case rendering a departure from them necessary in order to avoid immediate danger. Section 4401 provides that all vessels navigating the Great Lakes shall be subject to the navigation laws of the United States, when navigating within the jurisdiction thereof; and all vessels propelled in whole or in part by steam, and navigating as aforesaid, shall be subject to all the rules and regulations established in pursuance of law for the government of steam vessels in passing, as provided by this title. Section 4405 provides that the board of supervising inspectors shall establish all necessary regulations required to carry out, in the most effective manner, the provisions of this title; and such regulations, when approved by the secretary of the treasury, shall have the force of law.

Among the regulations of the supervising inspectors established in accordance with the previous section is rule 8:

"When steamers are running in the same direction, and the pilot of the steamer which is astern shall desire to pass on the right or starboard hand of the steamer ahead, he shall give one short blast of the steam-whistle as a signal of such desire and intention, and shall put his helm to port; and the pilot of the steamer ahead shall answer by the same signal, or, if he prefer to keep on his course, he shall give two short and distinct blasts of the steam-whistle, and the boat wishing to pass must govern herself accordingly, but the boat ahead shall in no case attempt to cross her bow or crowd upon her course."

It is in evidence that the collision occurred on the Canadian side of the Detroit river, and it is contended on the part of the appellees that the Canadian rules of navigation are different from those governing vessels of the United States in the waters of the United States. There is no proof in the record that, in making it obligatory upon passing vessels to signal their intentions, the rules of navigation under our law are different from those in force in Canadian waters; and, in the absence of such proof, we must assume that they are the same as the law of the forum. In the case of The Scotland, 105 U. S. 24, Mr. Justice Bradley, in delivering the opinion of the supreme court, said, on page 29:

"In administering justice between parties, it is essential to know by what law or code or system of laws their mutual rights are to be determined. When they arise in a particular country or state, they are generally to be determined by the laws of that state. Those laws pervade all transactions which take place where they prevail, and give them their color and legal effect. Hence, if a collision should occur in British waters, at least between British ships, and the injured party should seek relief in our courts, we would administer justice according to the British law, so far as the rights and lia-

bilities of the parties were concerned, provided it were shown what that law was. If not shown, we would apply our own law to the case."

See, also, The State of Alabama, 17 Fed. 847, 855.

It may be added that we are glad to avoid a conclusion which would vary the rules of navigation for American steamers as they pass and repass the imaginary national boundary line, in the Detroit river. See the language of Mr. Justice Brown on an analogous difficulty in the case of The Delaware (decided by the supreme court March 2, 1896) 16 Sup. Ct. 516.

There is some conflict of evidence in this case, but not as much as is usual in collision cases. In the opinion filed by the learned district judge, the main facts are stated much as we should have found them were this an original hearing; but we differ widely from the conclusions which he draws from those facts as to the culpability of the steamer Mackinaw in respect to the collision. In our opinion, the learned judge gave to the fact that the Mackinaw was properly manned, and that the tug was not, too great weight in determining whether the Mackinaw was at fault. The ordinary presumption that follows from such facts may be conceded, but it is not a conclusive presumption, and must yield if overcome by the plain inferences from proven or admitted circumstances.

We find two faults in the navigation of the Mackinaw: First, in failing by signal to establish an agreement with the Majestic as to how she should pass; and, second, in porting her wheel instead of passing under the stern of the Majestic, when she had reason to believe that the Majestic was about to round to under a port wheel. Until the Mackinaw checked when 400 feet astern of the Majestic, she was going over land 10 miles an hour, or better, and about four times as fast as the Majestic. She was gaining on the Majestic, therefore, 660 feet, or more than three times her length, every minute. When she was three lengths astern, her officers knew that, at this speed, in less than a minute their vessel would be abreast of the Majestic. The captain had had, from the time he made out the Majestic and her course, the clearly-formed intention to pass on this starboard hand. It certainly became his duty to signify this intention when, in so short a time, he must carry it into effect. Supervisor's rule No. 8 would be useless, indeed, if it applied only to an overtaking vessel when her bow is lapping the stern of the overtaken vessel. The purpose of the signal is to solve the doubt in the mind of each pilot or master as to the course of the other vessel before the vessels are so near each other that the doubt may be dangerous. It is to render certain to each master the proper course of his own vessel. The Mackinaw, at full speed, could not be stopped, even by reversing her engines, in less than three of her own lengths. With this limit on the control of her action, it was clearly reasonable that, when she was but this distance astern of a vessel moving so slowly as the Majestic, she should indicate her intention to pass by signal. But it is said that, when she was two lengths astern, her captain became doubtful of the intention of the Majestic, and checked, because he feared she

was about to round to. This doubt was an additional reason why he should indicate his intention by signal. In The Great Republic, 23 Wall. 20, which was the case of a collision between an overtaking and an overtaken vessel, the supreme court laid down the rule that a pilot, when close to a vessel before him, making movements which are not intelligible to him, should make and exchange signals, and ascertain positively her purposed movements and maneuvers. By a single short blast, the captain of the Mackinaw might at once have ascertained from the Majestic's reply whether she was about to round to or was going up the river. Why did he not give it? The answer is that he did not then know on which hand he would pass her, and so, for the time, his ceased to be a passing vessel, and was not within the operation of rule 8. This excuse cannot be a true one. His intention to pass on the starboard hand remained, but he only checked down for fear the Majestic's movement might make it dangerous to attempt it. It is inexplicable that he ported his wheel when he checked, unless he still retained his purpose to pass the Majestic between her and the Canadian shore. By porting, he was making it more difficult to do anything but to carry out this purpose. What his evidence really means is that he had the same intention as before, but he was doubtful whether the Majestic would let him carry it out; and, thus interpreted, it only emphasizes his fault in not definitely ascertaining by signal what the fact was. He was still within rule 8 and his attempted excuse for not complying with it, instead of relieving him from its obligation, only makes clearer the mandatory character of its injunction upon him.

But, if he did not choose to signal and establish an agreement with the Majestic, it was certainly the duty of the captain of the Mackinaw to take every reasonable precaution to keep out of the way of the vessel ahead. The Governor, Fed. Cas. No. 5,645; Whitridge v. Dill, 23 How. 454; The Great Republic, 23 Wall. 20. If he feared that she was going to round to under a port wheel, then his maneuver, to be entirely safe, was to starboard his helm, and pass under the stern of the Majestic. There was ample room—nearly the whole width of the river—to the port hand of the overtaken vessel. If the Majestic had rounded to, the vessels would have become crossing vessels; and, under the directions for the 'seventh situation described in the seventh of the supervising inspector's rules, the proper course of the Mackinaw would have been to starboard and pass to port under the Majestic's stern. And, without regard to the regulations, this was the safe course, which the situation as it presented itself to the Mackinaw's captain clearly enjoined upon him. Instead of this, he ported his wheel, and carried his vessel towards the very path which the Majestic must take if she did what he feared she was about to do. It is true that he checked, and shortly after stopped, and shortly after reversed; but even then his vessel was going five miles an hour when she struck the tug, which, but 30 seconds before, had left the side of the Majestic in a straight course for the Canadian shore. The captain of the Mack-

inaw failed, upon cross-examination, to give any satisfactory explanation for his failure to signal or to pass under the stern of the Majestic at this juncture. We give a portion of it:

"Q. You thought this steamer, the Majestic, or whatever it was, was going to round to, probably, did you? A. I was not sure what he was doing. He appeared to be working across my course. Q. You turned to your second mate, and asked him if he thought that fellow was going to round to, down the river? A. Yes, sir. Q. Because the lights were going so straight across? A. Well, they were bearing across my course. Q. And, if he was rounding to, you think he was rounding to under a port helm? A. Yes, sir. Q. And so you ported your wheel? A. Yes, sir. Q. Would that be the proper maneuver, in your judgment? Should you not starboard your helm, and go under his stern? A. I wanted to see what he was going to do. I was not decided. I hadn't decided yet. Q. But you ported your helm? A. Yes, sir. Q. And you found your boat was not swinging fast enough, and you said, 'Port some more'? A. Yes, sir. Q. And all that time you were swinging towards the point to which this boat would be going, heading on, so you would meet her head-on if she were rounding to? A. I was swinging all the time. Q. Would it not be better, if that boat were rounding to, as she appeared to be, if you had gone under starboard helm? A. I didn't know what she was going to do. That is what I stopped for, to find out. Q. You were porting all the time? A. Yes, sir. Q: Why did you port instead of starboard? A. Because I wanted to see what he was going to do; I was uncertain. Q. You thought maybe he was going to cross your bows? A. I was not sure; he kept bearing across that way. Q. And you found you were not swinging fast enough to port, and so you ported some more? A. Yes, sir. Q. Were you not swinging fast enough for what? A. Well, she kept coming towards me, and I ported more, so as to give him more room. Q. This was all after you got up how close to him? A. Well, we were probably little less than four hundred feet or twice the length of our boat; somewhere about that. Q. When you ported a little more? A. Yes, sir; he was closer when I ported a little more. Q. How much closer? A. I could not say exactly. Came up on him some, perhaps half the length of the boat. Q. You hadn't done anything but check at that time? A. When I ported more? Q. Yes, sir. A. I just rung to back about the same time,—or to stop, I should say."

This evidence is quite persuasive in its effect to show the fault of the Mackinaw in failing to establish an agreement by signal and in porting. The very awkward course of the Mackinaw, and the lame explanation of it by her captain, indicate that the Mackinaw had gone much nearer to the Majestic than two lengths before she checked and ported, and that, when the occasion arose for her to avoid a possible danger, she was so near the Majestic as to make it impossible for her to pass under the stern of the vessel she was overtaking, and her only possible maneuver was to port. Indeed, when pressed at the hearing for the reason why the Mackinaw did not starboard instead of porting, her counsel suggested as a reason that she was lapping the stern of the Majestic. If this be true, this only increases her fault in not signaling at an earlier time, and shows a gross fault in putting herself in a position so near the Majestic as to render collision probable. The Majestic did not change her course from the time she was first observed by the Mackinaw until the collision, and it is by no means clear what gave the captain of the Mackinaw the impression that she was about to round to. It is difficult to escape the suspicion that the sudden porting, checking, and stopping were due rather to some indication of the tug's presence on the

scene than to anything in the course of the Majestic; but, as the district judge credited the denial of this by the officers and men of the Mackinaw, we yield to his better opportunity to weigh the credibility of their testimony, and accept the explanation that it was the failure of the Majestic to starboard her wheel which troubled the captain and mate of the Mackinaw. On any theory, the faults of the Mackinaw in her navigation with respect to the Majestic are clear.

But it is argued that, because no collision with the Majestic did occur, the tug Washburn cannot complain of faults in the navigation of the Mackinaw with reference to a possible collision with the Majestic. We cannot concur in this view. Undoubtedly, the faults of the Mackinaw must have been the legal cause of the collision with the tug, to justify her condemnation. It may also be admitted that a vessel cannot be condemned for failing to observe precautions prescribed in passing or overtaking another vessel when there is nothing to indicate to the one that she is passing or overtaking the other, or, in other words, that the presence or absence of negligence in a person's conduct must depend on the knowledge which he has or ought to have of the situation with respect to which he is called upon to act. Louisville & N. R. Co. v. East Tennessee, V. & G. Ry. Co., 22 U. S. App. 102, 111, 9 C. C. A. 314, 318, and 60 Fed. 993. It is also true that the district court found that the captain and crew of the Mackinaw did not know of the presence of the tug at the side of the Majestic until just before the collision. Until the tug left the side of the Majestic, however, the tug, whether she was seen or not, was identified with the Majestic, and had the right to act upon the hypothesis that any vessel which was following close upon the Majestic with the intention to pass her would indicate this by the usual signal. What was due to the Majestic in this respect was due to her consort, the tug, even though those upon the Mackinaw were unaware of her presence, because, until sheering off, the tug was, in a legal sense, part of the Majestic. It is the duty of the overtaken vessel, under rule No. 8, not to cross the bow of the overtaking vessel, and not to press upon her course. The signal is to notify the vessel ahead that the duties enjoined upon an overtaken vessel are hers if she agrees to the signal. If, therefore, the Mackinaw had signaled her intention by one blast, and the Majestic had acquiesced by the same signal, it would have been a gross fault for either the Majestic or the tug to round to. Such a signal from the Mackinaw would certainly have prevented the tug from swinging off from the side of the Majestic across the path of the Mackinaw towards the Canadian shore. If this was due from the Mackinaw to the men in charge of the tug, as we have said, and if it would have prevented the collision, it was the legal cause of the accident. Moreover, the second fault of the Mackinaw in not passing under the stern of the Majestic was likewise a legal cause of the collision with the tug. The tug took the course which the Mackinaw expected the Majestic to take. The tug turned somewhat more quickly than the Majestic

could have turned; but, upon the facts found by the district court and a careful consideration of the evidence, it is clear to us that, had the Majestic rounded to, a similar collision with her would probably have followed the Mackinaw's extraordinary course. The identity of the Majestic and the tug continued, therefore, down to the time of the collision so far as the care and duty of the Mackinaw were concerned; and the owners of the tug may justly claim that, had the Mackinaw acted prudently with respect to what she feared would be the course of the Majestic, the collision would have been avoided.

But, while the Mackinaw was at fault, we are of opinion that the tug was not free from fault. She was short in her crew, and it is probable that if she had had a lookout, whose only duty it would have been to look up and down the river, to observe whether the passage across the river was free, he would have seen the lights of the Mackinaw, and the collision would have been avoided. It is contended by the counsel for the tug that the lights of the Mackinaw were obscured by smoke. This was possibly true to some extent. The wind was shifting just at the time of the accident from southeast to south, or possibly from south towards the southwest; and it may be that the smoke from one vessel or the other circled about and settled down for a short time between the tug and the approaching steamer. The evidence of the officers and men of the Majestic is quite strong with respect to this matter, and justifies the inference that there was some obscuration of the light. Indeed, the presence of smoke between the tug and the Mackinaw is the only reasonable explanation of the failure of the officers and men on the Mackinaw to observe the stern light of the tug after she had cast off from the Majestic, and it is the one accepted by the district court. But, while there was some dimming of the lights by the smoke, it was not of such a character that a steady, close, and attentive observation from the tug would not have overcome the difficulty. The failure of the tug to have a lookout was a direct violation of the regulations, and it may be fairly presumed that, if the tug had been properly manned, the accident might have been avoided. The Ariadne, 13 Wall. 478. Before the execution of such a maneuver as the tug proposed to carry out, it would have been the duty of a lookout upon the tug to look up and down the river in the usual path of vessels at that point. He could have done so by stepping to the starboard side. His opportunity and duty would have been quite different from that of a lookout in the eyes of a large vessel like the Mackinaw, on which the cabins amidships would have prevented such observation to the rear. The result is that the accident occurred from both the fault of the tug and the Mackinaw, and that the damages caused by the collision to the tug must be divided between them.

There remains to be considered the liability of both steamers for the loss of life. The collision in question, as already stated, took place in the Canadian waters of the Detroit river, and within the

jurisdiction of the province of Ontario. The libelants below introduced in evidence chapter 135 of the Revised Statutes of Ontario of 1887, in which it is enacted that "where the death of a person has been caused by such wrongful act, neglect or default as would (if death had not ensued) have entitled the party injured to maintain an action and recover damages in respect thereof, in such case the person who would have been liable if death had not ensued, shall be liable to an action for damages notwithstanding the death of the person injured, and although the death has been caused under such circumstances as amount in law to a felony"; and that "every such action shall be for the benefit of the wife, husband, parent and child of the person whose death has been so caused, and shall be brought by and in the name of the executor or administrator of the person deceased, and in every such action a judge or jury may give such damages as he or they think proportionate to the injuries resulting from such death, to the parties, respectively, for whom, and for whose benefit, such action has been brought; and the amount so recovered, after deducting the costs not recovered from the defendants, shall be divided amongst the above mentioned parties in such share as the judge and jury advise and direct." It never has been directly affirmed by the supreme court of the United States in a case presenting the question that an action by libel in personam for damages for death under statutes like Lord Campbell's act, in force where the cause of action arises, can be entertained and carried to decree in a federal court of admiralty, but the question has been most exhaustively considered by Judge Brown, of the district court of New York, in the case of The City of Norwalk, 55 Fed. 98; and it is evident from a consideration of the language used by that learned admiralty judge that he has no doubt of the power and duty of the court of admiralty to enforce rights under such statutes on libels in personam. The authorities which he masses and the reasons which he arrays in support of his conclusions leave nothing to be desired. He refers to the language of Mr. Justice Brown, upon the supreme bench, in the case of The Corsair, 145 U. S. 335, 347, 12 Sup. Ct. 949, as follows: "If it [the local law] merely gives a right of action in personam for a cause of action of a maritime nature, the district court may administer the law by proceedings in personam." The decision in The City of Norwalk was affirmed on appeal by the court of appeals of the Second circuit, sub nomine The Transfer No. 4 (20 U. S. App. 570, 9 C. C. A. 521, and 61 Fed. 364); and, until there is a decision to the contrary in the supreme court, we consider the law settled in favor of the propriety of such an action in federal courts of admiralty. The St. Nicholas, 49 Fed. 676. In Monaghan v. Horn, 7 Can. Sup. Ct. 409, which was referred to as evidence in this case by a Canadian barrister called as an expert, it was held that no recovery for loss of life by negligence could be brought in a Canadian vice admiralty court except in conformity to Lord Campbell's act, but it was plainly intimated that, when brought by the representatives of the deceased named in the act, the ad-

miralty jurisdiction to enforce the act would be sustained. See, especially, the judgment of Mr. Justice Henry.

We come, then, to the question how far the recovery of the representatives of the deceased persons is to be affected by the negligence of the tug. It seems to be well settled by the law of England and by the law of this country that rights of action arising in admiralty under Lord Campbell's act and similar acts are to be enforced according to the principles of the common law, and that contributory negligence is a complete bar to a recovery. This was settled in the case of The Bernina, decided by the house of lords of England (13 App. Cas. 1), by the court of appeal of England (12 Prob. Div. 58), and by the admiralty division of the high court of judicature (11 Prob. Div. 31). It is also decided in this country, in the case of The A. W. Thompson, 39 Fed. 115, and The City of Norwalk, 55 Fed. 98. In the absence of evidence that the law of Ontario is different, the same rule must be enforced in the case at bar. The recovery of Mrs. Hurley, as administratrix of her husband, is therefore completely barred, because he was the managing owner of the tug, must have been familiar with the fact that the tug was without a lookout and short-handed, and was responsible for the negligence of the master of the tug, who was his agent.

William Robinson, however, was a mere passenger upon the tug, and there was no relation of agency between him and the master of the tug, and he had nothing whatever to do with the manning of the vessel. Under the decision in Little v. Hackett, 116 U. S. 366, 6 Sup. Ct. 391, it is certain that, within the federal jurisdiction in this country, the negligence of the owners of the tug, or their servants, cannot be charged to him or his representatives, and, therefore, that his representatives can recover damages, both from the owners of the Mackinaw and from the owners of the tug. The owners of the tug, however, are not made parties defendant to this suit. Under the fifty-ninth admiralty rule, the owners of the Mackinaw did bring in the tug as a respondent, but the tug is not liable in rem under the Canadian act. The Corsair, 145 U. S. 335, 12 Sup. Ct. 949. Nothing but a personal action will lie against her owners; and, as no decree in rem can be rendered against her, she must be dismissed. The result is that the decree, if one is to be rendered in favor of William Robinson's administrator, must be entered for all the damages against the Detroit & Cleveland Steam Navigation Company, the owners of the steamer Mackinaw.

It is contended, however, that under the common law of the province of Ontario, in the dominion of Canada, the negligence of the owners of the tug is to be imputed to a passenger on the tug as contributory negligence, and bars his recovery for personal injury against the steamer, and that the same rule is applicable in an action for loss of life under Lord Campbell's act, by his administrator, in a libel in personam for damages. As the collision was in Canadian waters, and within the province of Ontario, the rights and liabilities of the parties are fixed and are to be determined by the

law of Ontario. The Scotland, 105 U. S. 24. This is, of course, foreign law, and as such is to be proven as a fact. Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 9 Sup. Ct. 469.

Evidence of an expert, a barrister, at Windsor, Ontario, was offered by the respondent, for the purpose of showing that the judgment in the English case of Thorogood v. Bryan, 8 C. B. 115, stated the law as it is in force in Ontario; and that case, it is conceded, supports the proposition that the contributory negligence of the tug must be imputed to Robinson, though a passenger. The evidence of the barrister is quite unsatisfactory. In the Canadian cases which he cites (Castor v. Uxbridge Tp., 39 U. C. Q. B. 113; Nichols v. Railway Co., 27 U. C. Q. B. 382; Winckler v. Railway Co., 18 U. C. C. P. 250), there is no discussion of the question, and no citation by the court of Thorogood v. Bryan; and it is not by any means clear that the driver in each of those cases was not in fact the servant or agent of the person injured. He admits on cross-examination that the case of Thorogood v. Bryan has been completely repudiated and overruled in England, in the case of The Bernina, 12 Prob. Div. 58, by the court of appeal, and by the house of lords, 13 App. Cas. 1. He concedes that the decisions of the privy council of England are those of a court directly superior to the courts of Ontario and the supreme court of Canada. He states that there has been no reported case decided in Ontario in which the effect of The Bernina decision upon the law of that province has been considered, and he states that it is problematical whether the appellate courts of Canada would follow the house of lords or their own previous decisions. This leaves it for the court to construe, and give effect to, his evidence. He refers to the decisions of the judicial committee of the privy council as authoritative in Canada, and among these is that of Trimble v. Hill. 5 App. Cas. 342. In that case the privy council was considering the appeal and decision of the supreme court of New South Wales in construing a colonial wager act. The act was in the same words as an act of the English parliament. The English court of common pleas had construed the English act one way, and its construction had been followed by the supreme court of New South Wales. Subsequently, the court of appeal of England had overruled the decision by the English common pleas; and the supreme court of the colony, coming again to consider the question declined to follow the court of appeal of England, and stood by its previous decisions. The privy council held that, in so doing, the supreme court of New South Wales erred. They said:

"Their lordships think the court in the colony might well have taken this decision as an authoritative construction of the statute. It is the judgment of the court of appeal, by which all the courts of England are bound, until a contrary determination has been arrived at by the house of lords. Their lordships think that, in colonies where a like enactment has been passed by the legislature, the colonial courts should also govern themselves by it. The judges of the supreme court, who differed from the chief justice, were evidently reluctant to depart from their own previous decision in the case of Hogan v. Curtis, 6 New South Wales R. 292; but they might well have yielded to the high authority of the court of appeal which decided the case

of Diggle v. Higgs, 2 Exch. Div. 422, as the English court which decided Batty v. Marriott, 5 C. B. 819, would have felt bound to do if a similar case had again come before it. Their lordships would not have felt themselves justified in advising her majesty to depart from the decision in Diggle v. Higgs, unless they entertained a clear opinion that the construction it has given to the proviso in question was wrong, and had not settled the law; since, in their view, it is of the utmost importance that, in all parts of the empire where English law prevails, the interpretation of that law by the courts should be as nearly as possible the same. Their lordships, however, do not dissent from, nor do they desire to express any doubt as to, the correctness of that decision, which, it may be assumed, has settled the vexed question of the construction of a not very intelligible enactment."

If this be the effect of a decision of the English court of appeal in respect to a statute, there would seem to be no doubt of the controlling influence of the decisions of the house of lords upon questions of the common law throughout the British empire. In view of this result which follows from the cross-examination and admissions of the expert himself, the result of The Bernina decision of the house of lords upon the validity of the doctrine of Thorogood v. Bryan, in the province of Ontario, is not so problematical as the witness seemed to think. We find as a fact that the law of Ontario is that which has been pronounced to be the English common law by the house of lords in The Bernina Case.

· It remains to state what the action of this court must be. The decree of the district court dismissing the libel in personam of John Hurley's administratrix is affirmed. Its decree dismissing the libel in personam of Robinson's administrator is reversed, with directions to direct an inquiry into the question of the amount of damages accruing to the libelant, and the apportionment of the same for the benefit of the beneficiaries named in the Canadian statute from the loss of Robinson's life, and to enter a decree for the amount thus found and apportioned in favor of libelant, against the Detroit & Cleveland Steam Navigation Company. The decree of the district court dismissing the libel in rem of the owners of the tug against the steamer Mackinaw is reversed, with directions to direct an inquiry into the damage suffered by the tug from the collision, and to enter a decree for one-half the amount so found in favor of the owners of the tug against the Mackinaw. The costs in this court and in the district court in the Robinson case will be taxed against the Detroit & Cleveland Navigation Company. The costs in this court in the Hurley case will be taxed against the appellant. The costs in this court and in the district court will be taxed against the Mackinaw in the libel of the Washburn.