TRAUFFLER v. DETROIT & CLEVELAND NAVIGATION CO. et al. McCLURE v. SAME. NORBURY v. DETROIT & CLEVELAND NAVIGATION CO.

(District Court, W. D. New York. July 19, 1910.)

1. TOWAGE (§ 18*)—STEAMER AND TOWING TUG—EXCESSIVE SPEED—LOSS OF TUG.

A collision occurred in Buffalo river near the South Pier in the daytime between the steamer Western States, which had entered the river to go to her dock farther up, and the tug Princeton, which was waiting to take her in tow. The evidence showed that the steamer approached at a speed of not less than eight miles an hour, and that the tug proceeded ahead and took a line from her when 30 feet ahead of her and about 15 feet on her port side, but the steamer overtook and ran into the tug causing her to sink immediately; three persons on board being drowned. Held, that the steamer was in fault for navigating in the river at such speed in violation of the federal statute, which forbids a greater speed than six miles an hour; that the tug was also in fault for not

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

keeping farther away and for taking the line while the steamer was going at such excessive speed, which was contrary to custom and dangerous.

[Ed. Note.—For other cases, see Towage, Cent. Dig. § 40; Dec. Dig. § 18.*

Collision with or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

2. ADMIRALTY (§ 21*)—ENFORCEMENT OF STATE LAWS—ACTION FOR WRONGFUL DEATH.

The statutory law of a state authorizing recovery for wrongful death may be enforced in a court of admiralty where the death occurred in a collision in the waters of the state.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. § 219; Dec. Dig. § 21.*]

3. COLLISION (§ 139*)—ACTIONS FOR WRONGFUL DEATH—LIABILITY OF VESSELS IN COLLISON.

Where both vessels were in fault for a collision in the waters of a state, an action may be maintained under a state statute against the owners of both to recover for the death of members of one of the crews caused by such collision.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 139.*]

4. NEGLIGENCE (§ 89*)—IMPUTED NEGLIGENCE—FELLOW SERVANTS—MASTER AND CREW OF VESSEL.

The master of a vessel and members of his crew are not fellow servants in such sense that his negligence in the navigation of the vessel is imputable to them.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. § 134; Dec. Dig. § 89.*

Who are fellow servants, see note to Flippin v. Kimball, 31 C. C. A. 286.]

5. DEATH (§ 21*)—ACTION FOR WRONGFUL DEATH—DEFENSES.

It is no defense to an action for wrongful death that another was also in fault for the tortious act.

[Ed. Note.—For other cases, see Death, Dec. Dig. § 21.*]

6. MASTER AND SERVANT (§ 182*)—MASTER'S LIABILITY FOR INJURY TO SERVANT—NEW YORK STATUTE—"WHOSE SOLE OR PRINCIPAL DUTY IS THAT OF SUPERINTENDENCE."

The master of a vessel who has sole charge of its navigation is one "whose sole or principal duty is that of superintendence" within the meaning of the New York employer's liability act (Laws 1902, c. 600), and, under such act, the shipowner is liable for the negligence of the master causing an injury to a member of the crew under him.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 182.*]

7. COLLISION (§ 139*)—ACTION FOR WRONGFUL DEATH—DEFENSES.

The fact that a person killed in a collision, for which both vessels were in fault, was on board one of them without right and without the knowledge of her officers at the time of collision, is no defense to an action for his death against the owner of the other vessel.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 139.*]

In Admiralty. Actions by Mary Trauffler, administratrix of the estate of Frank M. Trauffler, deceased, and by Alice A. McClure, administratrix of the estate of William A. McClure, deceased, against the Detroit & Cleveland Navigation Company, as owner of the steamer Western States, and the Hand & Johnson Tug Line, as owner of the tug Princeton. Also by Charles Norbury, administrator of the estate of Raymond E. Norbury, deceased, against the Detroit & Cleve-

land Navigation Company, as owner of the steamer Western States. Decree for libelant in each case.

Hamilton Ward, for libelants.

Hoyt, Dustin, Kelley, McKeehan & Andrews and Rogers, Locke & Babcock, for Detroit & Cleveland Navigation Company.

Brown, Ely & Richards, for Hand & Johnson Tug Line.

HAZEL, District Judge. These are libels filed in personam by the administratrices of Frank M. Trauffler, deceased, and William A. McClure, deceased, against the Detroit & Cleveland Navigation Company, a corporation of the state of Michigan, and owner of the steamer Western States, and the Hand & Johnson Tug Line, a corporation of the state of New York, and owner of the steam tug Princeton, and by the administrator of Raymond E. Norbury, against the Detroit & Cleveland Navigation Company alone. The actions arose out of the same subject-matter and were tried together; it being agreed by the parties that the evidence taken so far as applicable should be considered in each case. The libelants demanded trial by jury under section 566 of the Revised Statutes of the United States (U. S. Comp. St. 1901, p. 461), and thereupon petitions for limitation of liability were filed by claimants under admiralty rule 54, which it was contended prevented such trial by jury, but, before this question was ruled upon, the said demand was withdrawn and the hearing had before the court.

The material facts show that in the daytime on May 24, 1909, a collision occurred in Buffalo river near the South Pier, within the limits of the city of Buffalo, between the steam tug Princeton and the large passenger steamer Western States, in consequence of which Trauffler and McClure, engineer and fireman, respectively, of the tug, and Norbury, who was aboard the tug without the knowledge of her owner or master, were drowned, and the steam tug sunk. The libels charge joint liability, in that both vessels were negligently navigated, the steamer for proceeding at a rate of speed prohibited by the United States statutes prescribing a rate of speed in Buffalo river not exceeding six miles an hour and for violating the ordinances of the city of Buffalo limiting her speed to three miles an hour, and the tug for navigating in too close proximity to the steamer. The answer interposed by the Western States denies negligence on her part, and alleges that the Princeton negligently sheered across her bow which alone was the cause of the collision. The Western States is a side-wheel steamer, 366 feet over all, and 89 feet wide from the extremities of her paddles and paddle boxes. At the time of the collision, she was on her return trip from Detroit to Buffalo, and bound for her pier about one-half mile from the entrance to the river. It was her custom to be towed to her berth by a tug belonging to the Hand & Johnson Tug Line from a point opposite the South Pier near the entrance to the channel or river. The Princeton was 70 feet long, and had a crew of four, consisting of master, engineer, fireman, and deck hand. On the morning in question her master navigated the tug to a customary position on the South Pier to await the approach of the Western States, intending to take her bow line when she came alongside. When the steamer rounded the outer breakwater about 2,400 feet from the point where he was waiting,

the tug proceeded ahead slowly to the middle of the river, and then stopped her headway. She waited until the steamer came about 200 feet of her stern, and then went ahead slowly, accelerating her speed to her capacity as the steamer gained on her. The heaving line was cast by the steamer's lookout as she came alongside the tug, which was about 30 feet ahead of the steamer and 15 feet off her port side. The fireman and the deck hand pulled the line aboard. The steamer gained on the steam tug, and with the bluff of her bow struck or shoved on her starboard quarter. The Princeton thereupon rapidly hard astarboarded, a proper maneuver under the circumstances, but she nevertheless deviated from her course, crossed the bow of the steamer, and rolled over to port and sunk. The crew and Norbury leaped into the water, but the master and deck hand only were saved from being drowned. The Western States continued ahead a few moments while the men were swimming in the water, then slackened her speed, and reversed her engines. There is conflict in the evidence as to the rate of speed at which the steamer navigated in the river. Seventeen witnesses for the libelants, some of whom were either relatives or friends of the decedents or fellow employés, while others were impartial and disinterested by any ties and well qualified, testified in substance that the steamer was going at the rate of 8, 10, or 12 miles an hour at the time of the accident. The master and wheelsman of the steamer Gargantua, which was moored to the dock close by, testified that they noticed that the Western States entered the mouth of the river at such a rapid rate of speed that they put out additional mooring lines. The steam tug Mason was astern of the steamboat, and, though she intended to take her stern line to assist in towing her, she was unable to do so on account of her excessive speed. Capt. Farrell, a skilled and trained harbor pilot, testified that in his estimation the Western States exceeded nine miles an hour in the river; that, to keep up astern, he was obliged to maintain the speed of the Mason at 10 or 11 miles an hour to the South Pier and after entering the river at 9 miles. His observations are corroborated by his engineer and deck hand. There is other credible testimony, notably that of Capt. Massey and Hollingshead, who were on a naptha launch which also followed in the wake of the steamer, tending to show that she was slow to reduce her speed after rounding the breakwater, and in their opinion she was moving through the water at the South Pier at a rate of 9 miles an hour. The testimony of Capt. Madigan is entitled to careful consideration. He was aboard his vessel moored in the river alongside of the Lackawanna Pier close to the place of collision. He swore that the steamer and tug, when 150 feet distant from where he stood, navigated parallel with each other. The steamer was going "a good strong 8 miles an hour," and the tug "about holding her own," and the "bluff of the bow of the Western States caught the fan tail of the tug and rolled her over to port," and in five seconds the tug was out of sight. Two passengers on the Western States testified that their attention was drawn to her unusually fast speed after she was in the river. Reference to the proof for the Western States indicates that her master, the engineer, first and second mates, wheelsman, lookout, and others of the crew substantially swore that she was running at the

rate of 18 miles an hour as she approached the outer breakwater; that her speed per hour as she rounded the outer breakwater was 10 or 12 miles; that she checked, and at the South Pier at the point of collision she did not exceed 4 or 5 miles an hour.

The Nicholson log, a patented contrivance for recording the speed and movements of vessels on a chart, was received in evidence, and indicates on its face by red lines that the vessel's speed was approximately five miles an hour. If the Nicholson log was properly adjusted and operative at the time of the collision, its showing would undoubtedly be decisive, and the rejection of the contra oral testimony would be imperatively required. But such a conclusion would necessarily depend upon the credibility of the testimony that the chart correctly scheduled the rate of speed, that the instrument was operative, properly adjusted, and in actual use. But, however useful the device, its probative value is weakened by the fact that it concededly fails to accurately show when the stoppage of the steamer occurred. Mr. Nicholson on this point substantially testified that, "if a boat came to a sudden stop, the line would keep on going down until it got to zero." If the vessel had stopped at a speed of seven or eight miles an hour, the only indication would have been that the pointer would have continued to go down, and, "if the steamer had stopped at five or eight or ten miles an hour, theoretically there is a difference in the line, but practically you cannot see it. You wouldn't notice it." I am left unpersuaded as to the corroborative value of the log in question, and have therefore disregarded it.

There are, it is true, discrepancies in the affirmative showing as to the speed of the steamer, and as to the asserted collision between her and the tug before she rolled to port, but such discrepancies are not of a substantial nature. It substantially appears by a preponderance of the evidence that the Western States was navigated at a rate of speed approximating eight miles an hour; that she violated the United States statute which forbids navigation in the entrance channel of Buffalo river between the United States breakwater light station and the junction of the Buffalo river with the City Ship Canal at a greater rate of speed than six miles an hour. And, moreover, because of her excessive speed, it is not improbable that she ran into the Princeton, to whom she had thrown a tow line, causing her to sink and the decedents to drown.

But the steamer was not solely to blame. The facts and circumstances also show that the master of the tug was delinquent, and that he negligently navigated the tug. The fault of both vessels was the proximate cause of the accident, and each contributed thereto in such a manner that, if it had not been for their joint concurrent negligence, there would have been no collision or drownage. The Princeton was bound to keep out of the way of the steamer which she contracted to tow to her berth. It was negligence to take the heaving line at the speed the steamer was navigating or to run alongside or close to her when concededly the safety of the tug was endangered. Indeed, the proofs show that it was customary for a tug to refuse to take the line from a steamer under headway if her speed was excessive, and to blow a signal requesting her to reduce her headway. This rule or custom was not obeyed by the tug. According to her master, both ves-

sels were running at a dangerous rate of speed, and he realized the unusual speed at which the steamer was approaching the point where he was awaiting her, and in his estimation she was going eight miles an hour at the time of the impact. His explanation that he believed the steamer would diminish her speed so as to make it safe or proper for him to take the tow line does not excuse his lack of care or exonerate the tug, which must be held guilty of contributory negligence and in equal fault with the steamer.

As to the law of the cases, proctors for the Western States contend that, if the court holds both the steamer and tug in fault, there can be no recovery against either claimant, and that, as the decedents were joint actors in a common enterprise, the negligence of the Princeton or her master is imputable to them. Neither of these propositions are sound. Both sides concede that the rights of recovery herein by the libelants in their representative capacity are not enforceable by the ordinary maritime rules where contributory negligence bars recovery, and that the law of the state is controlling. Robinson v. Detroit & C. Steam Nav. Co., 73 Fed. 883, 20 C. C. A. 86; The City of Norwalk (D. C.) 55 Fed. 98; The Hamilton, 207 U. S. 398, 28 Sup. Ct. 133, 52 L. Ed. 264, affirming In re Old Dominion S. S. Co. (D. C.) 134 Fed. 95; The Hamilton (D. C.) 139 Fed. 906; Id., 146 Fed. 724, 77 C. C. A. 150. It is well settled that joint tort-feasors are not permitted to escape responsibility against them by proving that the other wrongdoer was also in fault for the tortious act. Little v. Hackett, 116 U. S. 366, 6 Sup. Ct. 391, 29 L. Ed. 652; The Hamilton, 146 Fed. 724, 77 C. C. A. 150. In The Hamilton, supra, the colliding vessels were held in fault. Various members of the crew of the Saginaw libeled the Hamilton, which contended that, as the Saginaw was negligent, the decedents were fellow servants with her master who negligently managed the vessel, and therefore the Hamilton could not be held. But the Circuit Court of Appeals, speaking by Judge Coxe in answer to this contention, said:

"No case with which we are familiar has gone to the extent of holding that the captain of a vessel is a fellow servant with the cook, the stewardess, and the other inferior members of the crew. A better illustration of the doctrine of alter ego can hardly be imagined. Goslee, the chief officer, was not negligent. What he did was under the direction of the master, and it would be a dangerous doctrine to hold a subordinate guilty of fault for obeying the orders of his superior. But, assuming that the rule as to the negligence of a co-servant can be invoked where the action is against another vessel, it would seem that the common-law rule that the negligence of a co-servant does not defeat the action unless such negligence is the sole cause of the disaster is also applicable. No matter how much such negligence may contribute, the defendant is not relieved if he himself be at fault."

The language quoted may fittingly be used to answer similar contentions in this case. There is nothing in the record to prove that the engineer, Trauffler, or the fireman, McClure, were personally negligent. True enough some testimony was given to the effect that the engineer sometimes increased or lessened the speed of the tug without receiving specific instructions to do so from her master, and that he and the fireman were in a position on the tug where they could observe the speed of the steamer, yet the master was in absolute control of the

management of the tug, and, under the circumstances, it was the duty of the subordinates to obey his instructions or commands. Certainly the engineer and fireman could have been no more negligent than was Goslee, the chief officer of the Saginaw. In The Hamilton, supra, the Supreme Court of the United States, distinguishing the case from The Osceola, 189 U. S. 158, 23 Sup. Ct. 483, 47 L. Ed. 760, held that the contractual relations between the seamen and the vessel could not affect the liability of another vessel which was in fault for injuries received. It may be doubted whether the master, the engineer, and the fireman were fellow servants, but, assuming that in the occupation of towing the steamer to her dock such relationship in admiralty or at common law existed, we must, as already pointed out, in this case look to the law of the state to guide us in our determination. By the employer's liability act of the state of New York (chapter 600, Laws 1902), it is expressly provided that an employé or his representatives shall not be deprived of their remedies against the employer where the negligent act was committed by any person in the service of the employer intrusted with the duty of superintendence or whose sole or principal duty was that of superintendence. By analogy a master who has sole charge of the navigation of a tug peculiarly exercises the principal duties of superintendence, and I think it may therefore be held that the libelants have a right of recovery against the Princeton, and, moreover, that both the tug and the steamer may be held. Hayward v. Key, 138 Fed. 34, 70 C. C. A. 402; Sweet v. Perkins, 196 N. Y. 482, 90 N. E. 50; The Hamilton, supra.

The next question relates to the liability of the Western States for the death of Norbury. It is claimed that, as he was not one of the crew of the Princeton, he was a trespasser, and had no right whatever aboard her and therefore there can be no recovery against the steamer by his representatives. It is not improbable that this question might be more effectively urged against the liability of the tug, but as to the negligence of the Western States it is not entitled to weight. She undoubtedly owed to him the duty of careful navigation as she did to the crew of the tug, and, as it is not shown that he contributed to the injury or had anything to do with the navigation of the tug, it is difficult, in view of what has been stated hereinbefore, to see why his representatives should be denied recovery.

Evidence was taken at the trial to enable the court to determine the amount of damages without reference to a master. It is shown that Trauffler was 35 years old, a widower, with four children, aged, respectively, 4, 7, 10, and 13 years, who were entirely dependent upon him for support. He was a competent tug engineer, receiving $130 per month for about eight months of the year, or the period of navigation, and about $15 per week during the winter months. He was a man of good habits and physically sound. His children are now in the custody of their grandmother, the libelant, and cared for by her. I think the sum of $7,500 would reasonably compensate the children for their pecuniary loss.

The claim of the libelant for the death of McClure is allowed at $3,000. He was 25 years old, unmarried, a fireman earning about $600 per year. He contributed to the support of his widowed mother,

who is 64 years old, and somewhat to the support of the minor children of a deceased sister.

The claim for the death of Norbury, which is against the Western States alone, is allowed at $2,000. He was 20 years old, unmarried, and contributed to the support of his father, who is 43 years old. His earning capacity as a fireman was about $500 or $600 per annum. He lived at home with his parents, who, however, were not dependent upon him for support.

There will be a decree for libelants, with costs, in each of the above-entitled cases, in accordance with the views hereinbefore expressed.