### CONTINO v. WILMINGTON STEAMBOAT CO.

(District Court, D. Delaware. December 24, 1914.)

#### No. 864.

COLLISION ☞95—STEAMER AND SMALL BOAT—FAULT.

Two Italian men and a boy in a row-boat on the Delaware river were caught in a sudden storm and given a line by a motor launch, which towed them into Christiana creek, on the way to Wilmington. A steamer entered the creek 500 feet behind them, and when about a half mile up the creek, as the launch turned to enter the canal on the south side, overtook them and in some manner the two men went overboard from the row-boat and were drowned. *Held*, on conflicting evidence, that the steamer struck and parted the tow-line and came into collision with the row-boat, and although it was not overturned the two men were either thrown, or in extremis jumped overboard; that the steamer was in fault for negligently or recklessly overrunning the smaller boats, when it could have reduced speed or passed them safely, the channel being 250

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

feet wide; that the launch was also in fault for not keeping better watch of the steamer and keeping out of her way; that the men in the row-boat, who were in tow and had no control over the movements of the launch, were not in fault.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. &xrarr;95.]

In Admiralty. Suit by Giovanni Contino, administrator of Andrea Contino, deceased, against the Wilmington Steamboat Company. Decree for libelant.

Leonard E. Wales, of Wilmington, Del., for libelant.

John F. Lewis and Francis C. Adler, both of Philadelphia, Pa., for respondent.

BRADFORD, District Judge. This is a libel in personam by Giovanni Contino, administrator of Andrea Contino, against the Wilmington Steamboat Company for the recovery of damages for the death of the decedent alleged to have been caused by negligence in the navigation of the steamboat City of Philadelphia while owned and operated by the respondent. The evidence is voluminous and conflicting and all of it has been examined by the court in connection with the briefs of the proctors for the respective parties. On the most careful consideration I have been able to give the case I have reached the conclusion that the libelant is entitled to a decree for damages on the ground that the decedent, without fault on his part, came to his death through negligence in the operation and management of the steamboat. The story told by the witnesses for the libelant is more reasonable and natural and in accord with the inherent probabilities of the situation than the account given by those testifying for the respondent. Indeed, the improbability of the correctness of many of the statements of the latter is so strong as well-nigh to render them incredible, even in the absence of directly opposing evidence. Among the facts touching which there is no dispute, or the proofs of which are so satisfactory as to leave no room for substantial doubt, are the following: The gasoline launch, Mary R., of about eight horse-power, left Pennsgrove, New Jersey, for Wilmington, Delaware, about half past four o'clock in the afternoon of Sunday, July 21, 1912; her owner, Henry A. Blackwell, Sr., managing the engine, and his son, Henry, having charge of the steering wheel which was located in the bow of the launch. In addition to the Blackwells there was on the launch a pleasure party consisting of two young men, five young women and a boy. The launch was about twenty-two feet long and seven and one-half feet wide, and was provided with a canopy top and canvas curtains. At the time the party left Pennsgrove the weather was clear, but while the launch was pursuing a diagonal course from that place toward Edge Moor those on board observed a storm approaching from the west, and shortly the sky became overcast and the wind and water rose; and when the launch was nearing the Delaware side of the river and at a point nearly opposite Edge Moor they saw a row-boat of about the same size as the launch with three Italians in it,—two men and a small boy—who

were calling and beckoning for assistance. The two men were Andrea Contino whose administrator is prosecuting this suit, and Frank Velino, both of whom were drowned later that afternoon. The boy was Joseph Cavallo, one of the witnesses for the libelant. The launch being thus hailed went to the row-boat and passed its own line,—a three-quarter inch manilla rope, which had been used during a season,—to the Italians who made it fast to the row-boat, the length of line between the launch and the row-boat being from twenty to twenty-five feet. About the time the launch picked up the row-boat the steamboat was seen from the former a considerable distance up the river. The launch proceeded with her tow to and into the mouth of the Christiana creek where the tow-line between the two boats was shortened to about twelve or fifteen feet to enable the launch better to control the movements of her tow, and Blackwell, Sr., warned those on the launch to watch out for the steamboat. The wind and rain continued to increase, and when the launch with its tow had nearly reached a point in the channel of the creek opposite the old government light-house, at the inner end of the jetty, the storm broke with violence. The wind was approximately from the northwest and unusually high. The rain fell in torrents accompanied by thunder and lightning. The steamboat reached the mouth of the creek about 5:19 p. m., some three or four minutes after the storm had burst in its severity at or near Edge Moor, and reducing her speed followed the middle of the channel toward Wilmington. When she reached a point where her bow was probably about her own length above the light-house she first saw directly before her in the channel, which extends at the width of two hundred and fifty feet to a point above the railroad bridge, the launch with its tow about five hundred feet distant. Here begins a material divergence in the evidence. There is testimony for the respondent to the effect that as soon as the steamboat saw the launch and her tow she gave a danger signal and stopped her engines for a very short time, probably not exceeding half a minute; that immediately thereafter the launch with its tow, either before or after a signal of two blasts from the steamboat, directed its course to starboard and passed entirely beyond the northerly side of the channel, the steamboat starting up her engines and continuing to follow the channel practically along its center; that although the steamboat closely watched the launch and its tow nobody was seen in the row-boat; that when the steamboat reached a point nearly abreast of the launch and a little below but nearly opposite the mouth of Lobdell's canal, which opens on the south side of the creek, the launch suddenly turned to port and went across the bow of the steamboat, about at right angles to the line of the channel; that at the time the launch took this turn the row-boat became separated from her; that the steamboat passed between the launch on her port and the row-boat on her starboard side, clearing the former by from forty to fifty feet and the latter by from one hundred to one hundred and fifty feet, approximately; and that nobody was in the row-boat. On the evidence there can be no reasonable question that the three Italians were in the row-boat and continued in it until after the launch with its tow had entered and was proceeding up the channel of the

creek. If either before or after the steamboat sighted the launch and her tow the three Italians had during the raging of the storm jumped from the row-boat into the water, in all human probability the boy Cavallo would not have been found alive on the southerly side of the creek, but would have shared the fate of his older and stronger companions. Further, although the launch and her tow were in full view of and were watched by a number of persons on the steamboat from the time they were first sighted until the steamboat passed between them, not one of them has testified to seeing the Italians or any of them jump overboard; nor has anybody testified to seeing any of the Italians jump or fall from the row-boat while in any position assigned to it by the witnesses for the respondent. Yet it cannot reasonably be questioned that during the storm two of the three Italians including the libelant's decedent jumped or fell from the row-boat into the creek and were drowned. But when, where and how did the catastrophe happen? The respondent's witnesses utterly fail to throw light on the subject. It is well-nigh inconceivable that any of the Italians should have jumped out of the row-boat if the account given by those witnesses as to the relative positions of the steamboat and the row-boat at the time the steamboat passed between the launch and the row-boat is to be believed. That the Italians were excited and alarmed when found off Edge Moor on the approach of the storm is beyond question. But after they were taken in tow by the launch and were under its control and protection there was nothing, if credence is to be given to the evidence for the respondent, to cause them or any of them to jump into the water. The instinct of self-preservation would have restrained them from so doing. According to that evidence the row-boat at the time the steamboat came abreast of her was to the north of and wholly beyond the northerly side of the channel and at a distance of from one hundred to one hundred and fifty feet from the steamboat, and it is absurd to assume that with that distance between the boats and the steamboat proceeding, not toward the row-boat, but up the channel, the Italians, or any of them, should have left a place of comparative safety and jumped into the jaws of death. The proctors for the respondent have in their brief, under the heading ".The Real Cause of the Disaster,"· advanced the following theory to account for the fact that two of the Italians jumped into the water:

"The steamboat passed between the launch and the skiff, close to the stern of the launch, but with the skiff safely on the port [starboard] side. The launch increased its distance from the steamboat and passed into the canal while the storm from the northwest blew the skiff closer toward the steamboat. The men jumped out, leaving the boy remaining, and the steamboat passed between the launch and the skiff," etc.

The vice inherent in this theory, if the words "blew the skiff closer towards the steamboat" are intended to convey the idea that the wind blew the row-boat into close or immediate proximity to the steamboat, is that not only is it unsupported by the evidence, but on the evidence adduced by the respondent involves a physical impossibility. As before stated, the evidence for the respondent is to the effect that when the steamboat came about abreast of the launch and her tow they had separated and while the launch was on the port side

of the stemboat some forty or fifty feet distant, the row-boat was on the starboard side at the distance of from one hundred to one hundred and fifty feet from the steamboat. The portion of the channel in which the steamboat was at that time runs a little to the north of west and south of east, and the wind was from the northwest, and consequently blew diagonally across the creek. Had the steamboat at that time been following the course of the channel, the wind would have been on her starboard bow; but having ported her helm in order to avoid colliding with the launch, she had so far swung to starboard as to be practically sailing in the eye of the wind, and going ahead at the speed of about six miles an hour. Under these circumstances it was palpably a physical impossibility that the rowboat should have been driven by that diagonal wind into close or immediate proximity to the steamboat or to any point so near to her as to induce the Italians to jump overboard.

All the witnesses for the respondent who testified as to the position of the steamboat, the launch and the row-boat with respect to each other and the channel of the creek, and as to controlling conditions and occurrences, immediately before and at the time the steamboat passed between the other two boats, were employed on or officially connected with the steamboat. There is, of course, nothing unnatural in this. Passengers could hardly be expected in the midst of the storm unnecessarily and without any reason to occupy the decks and move around the boat as is usual in good weather. The fact, however, remains, that all the witnesses for the respondent on these vital matters were officials or employés of the steamboat. The proneness of those employed on or in the navigation of vessels to "swear by the ship" in maritime causes involving alleged nautical fault, even at the expense of indulging in careless and reckless testimony, is proverbial. It has been fully exemplified in this case. Mangerbach, a deck-hand on the steamboat, stated that when the launch crossed the bow of the steamboat it was one hundred to one hundred and fifty feet "ahead of us," and that when the steamboat came abreast of the launch the latter was "about fifty feet on our port bow" and the row-boat "about one hundred feet on our starboard bow." Kane, pilot on the steamboat, states that the launch crossed the bow of the steamboat at least two hundred feet ahead of the latter vessel; that, notwithstanding that distance, the steamboat had to change its course to avoid collision with the launch; that when the steamboat came abreast of the launch and the row-boat, the launch was at the distance of twenty-five or thirty feet, and "probably more," on the port side, and the row-boat more than one hundred feet to starboard. Dolbow, master of the steamboat, states that "I passed the launch on my port hand about fifty feet, leaving the skiff to the northard, or my right or starboard hand, about one hundred or one hundred and fifty feet away"; that as the launch crossed the bow of the steamboat it was "about fifty feet ahead of us"; that "on a line from where the launch made the sheer, across our bow, we will say fifty feet ahead of us, the launch was over to the starboard end of the channel, and when she made this sheer and when she started to come across the launch [row-

boat] remained on the north side of the creek and she [launch] came across our bow, we will say, about fifty feet ahead of us." He further testified: "X. 231. When the launch took that sudden sheer it was, approximately, fifty feet ahead of your boat and at least one hundred feet to the starboard of your boat? A. Yes."

If at the time the launch·crossed the bow of the steamboat the former had been disconnected from the row-boat and was two hundred feet or one hundred to one hundred and fifty feet ahead of the steamboat, it is too clear for discussion from the evidence on the part of the respondent, if given credence, as to the direction in which the launch was moving and her rate of speed, that the launch would when the steamboat came abreast of her have been much further than fifty or sixty feet to the port of the steamboat, and there would have been no occasion for a change of course by the steamboat "to avoid collision with the launch." Further, if, as stated by Dolbow, the launch was at least one hundred feet to the starboard of the steamboat and approximately only fifty feet ahead of her when, as alleged, the· launch "took that sudden sheer," it would have been impossible for the launch to be about fifty feet ahead of the steamboat when crossing her bow. These are instances of reckless and unreliable statements on vital points and are of a nature seriously to affect the credit of those making them and deprive of probative force their statements on other material points even in the absence of opposing testimony. It is unnecessary at this point to multiply instances of· inconsistencies, improbabilities and impossibilities disclosed in the testimony of those connected with the steamboat. If it were true, as stated by witnesses for the respondent, that the steamboat did not collide either with the launch or with the row-boat, or break any towing line between them, and that in passing between the launch and the row-boat it cleared the former by about fifty feet and the latter by from one hundred to one hundred and twenty-five or one hundred and fifty feet, it would seem there was nothing for the master to report to the manager of the Wilson line on the day next following the disaster; and nothing to cause on that day any report on the books of the line that "we had hit a yawl or a launch coming in the creek," or to cause the witness Wilson to refer to the row-boat in question as having been identified as "being the one that was in the collision," or "in the trouble," or to afford Dolbow an opportunity on the morning next following the collision to read in the papers that the steamboat had collided with the skiff and two men had been drowned. But there is direct and positive testimony, which has not been overthrown, to the effect that the steamboat passed between the launch and the row-boat within only a few feet of the former, breaking the tow-line, striking the row-boat and jarring or jolting the two older Italians from it or causing them while in extremis to jump from it into the water with fatal results. Blackwell, Sr., the owner of the launch, states that he saw the steamboat pass within eight feet of the stern of the launch; and that the steamboat was "across our stern in a diagonal position." Mary H. Brennan, one of the occupants of the launch, states, in substance, that she was sitting in the

stern of the launch, where the curtain was open, and stayed there until the launch reached the canal; that she saw the steamboat coming up and its bow struck the row-boat "slanting ways," a glancing blow on the left side; that when the row-boat was hit it seemed to her that the men were thrown out; that the tow-line between the launch and the row-boat was broken as the latter was hit; and that the row-boat was not capsized by the collision. The witness Myers who was on the launch states in effect that he was standing in the stern of that boat as it proceeded up the creek; that the steamboat was coming "straight in the channel"; that he saw it hit the row-boat "on a slant"; that at that time the three Italians were in the row-boat; that to the best of his knowledge the jar of the contact between the steamboat and the row-boat knocked the two men out who were drowned; that the steamboat broke the tow-line between the launch and the row-boat, which was about fifteen feet long; and that the row-boat did not capsize. The witness Pierce, who also was on the launch, states that he was standing on its stern until the row-boat was hit by the steamboat; that it appeared to him that the men were knocked out of the row-boat; that he did not see the row-boat capsize; that the steamboat passed so close to the launch "you could touch it right with your hand"; and that the steamboat did not stop after the collision. Joseph Cavallo, who was between thirteen and fourteen years old at the time of the catastrophe and was in the row-boat, states, in substance, that it was raining hard and getting dark, and Andrea Contino and Frank Velino were under an umbrella in the row-boat, and that he was sitting in a small closet or recess in its bow; that he saw the steamboat and its lights, and told his two companions who commenced to halloo; that the steamboat was then quite near the row-boat; that his companions jumped into the water; that Andrea jumped first and then Frank; that he hallooed to Frank, "You leave me by myself;" that the steamboat was then about six feet from the row-boat; that he did not jump into the water because "there was a rope that got around my feet and that rope pulled me back in the row-boat, and the big boat [steamboat] passed just at the time"; that the steamboat struck the row-boat "on a slant way"; that after his companions had jumped into the water "I turned around and I saw them in the water, but I only saw their heads in the water"; that he never saw them any more; and that after hitting the row-boat the steamboat kept right on without stopping. On the question of the creation of liability it is wholly immaterial whether Andrea Contino was jarred or jolted from the row-boat into the water, or jumped overboard while in extremis.

An effort has been made on the part of the respondent to discredit Cavallo's account of the disaster by the production of evidence as to what he said or omitted to say with reference to it on the evening of its occurrence. In this connection his youth, his ignorance or imperfect knowledge of the English language, and his physical and mental condition at that time should not be overlooked. Cavallo states that after the steamboat struck the row-boat he was so scared he could not remember whether it passed along the right or left side of the

steamboat, but that it went over near the shore and "I jumped over the water and there was a lot of water there and high grass where I jumped"; that then "I went one place and there found another. I went another place and there was another, and then there was nowheres else to go and so I climbed up a tree"; that he saw another boat and commenced to halloo and "they came in and got me"; and that before he was rescued "I was on a little track; then I went on top of the little bank and from the little bank I went in water and grass." Neal, who was on the sloop Delaware at the time of the catastrophe, testifies to the effect that Cavallo was picked up when the storm had abated on the south side of the creek in the "reeds and splatter-docks" in water up to his neck; that he looked about eleven or twelve years old; that what attracted attention to him was his exclamation, "Oh, Oh;" that he said nothing as to how he came to be in the water; that "when he came to himself" he was asked about "any men being drowned" and "he just pointed his hand down. He couldn't say anything, he was so excited." Appleby, also on the Delaware, states that Cavallo's "chest was heaving like—he was talking in broken English like. * * * We could get all kinds of things from him, first one way and then another way." McNally, also on the Delaware, says: "I couldn't understand what he was trying to tell." Gallagher, also on the Delaware, states that when Cavallo was found he was "right in the marsh, in the splatter-docks, between the splatter-docks and the reeds"; that he spoke broken English; that he was excited and "you couldn't get any sense out of his story at all"; that he "claimed there were two drowned," but "whether they were men or women we couldn't understand from him"; and that "I took the boy up and handed him over to a policeman." It appears that this young boy was then, on the same night, instead of being removed to his home and cared for, taken to the police station in Wilmington, and there while "frightened" and "excited" and "soaking wet" subjected to an examination. Without pausing to comment upon the lack of consideration displayed by the police authorities in this connection, to use no harsher term, it is evident that anything Cavallo in his then condition or on the Delaware shortly after being extricated from the "reeds and splatter-docks" may have said or omitted to say is justly to be subordinated in weight and importance to what he has said or omitted to say in his testimony duly taken before the commissioner in this cause. A large amount of testimony to which I attach but little, if any, importance, has been introduced on each side for the purpose of supporting or rebutting certain statements of Cavallo as to his movements after the catastrophe and before he was rescued by the Delaware. Whether he climbed one tree rather than another, or climbed any tree, and whether he wandered a few or many hundred feet along or near the southerly bank of the creek, and how many minutes he stayed in any given place, are incidental inquiries having no direct bearing upon the truthfulness of his statement that the steamboat struck the row-boat and that his two companions when only a few feet from the steamboat jumped into the water. Whatever importance they might under any circumstances possess would arise from

the consideration that if he testified untruthfully or incorrectly as to such collateral details it would or might injuriously affect or destroy the credibility of his testimony on the vital question whether his companions did not remain in the row-boat until they were in extremis by reason of the proximity of the steamboat. In this connection two things should be said. First, the witnesses produced against him have not broken down his testimony. He certainly was found on the south side of the creek after the catastrophe, and on the evidence there can be no reasonable doubt that the row-boat, although caused to rock and ship water, was not capsized by contact with the steamboat, and after the steamboat passed by was carried by the northwesterly wind to the south side of the creek at a point about six hundred feet below the canal. Thus Cavallo within a few minutes after the collision must have reached the south side of the creek where his wanderings began. During the taking of the testimony Cavallo was taken down the creek where he pointed out a tree on the southerly side up which he had stated he had climbed. This tree is at the distance of about sixteen hundred feet from the easterly side of the canal measured eastwardly along the creek bank. Cavallo says:

"I was three minutes in that tree and then I saw on the river another boat and I commenced to holler, and they came in and got me. * * * I came down from the tree and I was going towards the boat and the boat was coming towards me. * * * I was on a little track; then I went on top of the little bank and from the little bank I went in water and grass. * * * I tried to tell those people, but they didn't understand me; and they were the ones that took the row-boat that we had."

Neal and Gallagher, who were on the Delaware, testified that if Cavallo had been on the southerly side of the creek, as stated by him, it would not have been possible for him to reach the point where he was found on account of the water and reeds. This is not only an unreasonable surmise but is directly opposed to the evidence. Unquestionably Cavallo not only was on the southerly side of the creek but he was at the time of his rescue in the water and reeds. There is no evidence that he reached that point from any other direction than the southerly side of the creek. The recklessness of statement which characterizes the testimony of Neal and Gallagher does not commend them to this court as reliable witnesses. Both of them, without indulging in approximation, state with an impossible exactness that the distance between the easterly side of Lobdell's canal and the place where Cavallo was picked up was "two thousand and fifty-seven feet." And Neal states that the Delaware came to anchor on the south side of and outside the channel at the point marked "X N" on the map of the Christiana creek used in evidence; this point, according to the scale of the map, being about four hundred and twenty-five feet distant southwardly from the southerly side of the channel and five hundred and fifty feet from the center of the channel; that the Delaware was just about to anchor as the steamboat passed and that the latter was then proceeding "right in the channel" and continued so to follow its center as far as he could see her. The impossibility that Neal on the Delaware under conditions then existing should know that the steamboat was proceeding in the middle of or in what part

of the channel is too obvious for further comment. Later he states with utter inconsistency that he guessed the steamboat passed within thirty yards of him. Gallagher also states that he thinks the steam-boat from the time she came abreast of and passed the Delaware and until he lost sight of her was keeping in about the middle of the channel; and that he thinks he knows where the channel is. He then testifies:

"X. 145. Could you see either side of the creek? A. No. X. 146. How did you know where this channel was and where it was not? A. How did I know where the channel was? X. 147. Yes; if you couldn't see from one side of the creek to the other, how did you know where the channel was while the storm was on? A. We were going right down the channel, we could see the jetty when we came in there. After we came in there then we couldn't tell anything at all. We took for granted that the Wilson boat was running in the channel, for we knew she couldn't run in any other place."

It is hard to conceive of looser or more reckless statements with respect to the position and course of the steamboat in the channel than are contained in the testimony of these two witnesses. It is as unnecessary as it would be tedious to refer to various contradictions and inaccuracies as between Neal and Gallagher in their statements. They have not, I think, in any manner or to the slightest degree impaired the strength of Cavallo's evidence, either as to his movements and experience on the southerly side of the creek or to the facts of a collision between the steamboat and the row-boat and the jumping overboard of his companions while in extremis. In the next place Cavallo has, as has already appeared, been fully and satisfactorily corroborated as to the collision and its concomitants by witnesses having no interest in the result of this case.

How did the collision happen, and what was its cause? The explanation to be accepted as true is the one which more than any other reconciles conflicting testimony and accords with undisputed facts, reasonable and apparently truthful evidence, and the probabilities of the case, growing out of the weather conditions and the policy and intention of those respectively controlling the movements of the steamboat and the launch. The former was bound from Philadelphia to Wilmington and, of course, it was intended that after entering the mouth of the creek she should pursue its channel, moving in such portion or portions of it as should be safe and most convenient for her, regard being had to the direction and force of the wind and to other elements proper to be considered. By reason of the violence of the wind, blowing diagonally across the channel it was natural that the steamboat should as she proceeded have her bow directed to windward to a greater or less extent in order to counteract the tendency of the steamboat to drift under the pressure of the wind out of the channel and on the southerly shore, and, other things being equal, to keep well away from that shore, and approximately in the middle of the channel. The launch had been bound from Pennsgrove to a point far above the place of collision. But owing to the approach of the storm Blackwell, Jr., who was steering the launch, states that before it got into the creek he decided to go into the canal. This was a reasonable and natural decision, and it was equally reasonable and

natural that he should desire and intend to reach the canal by the safest and most expeditious course. The distance from the light-house to the canal by way of the channel is twenty-six hundred feet, and it appears from the map that a straight line lying wholly within the channel may be drawn from a point in it opposite the light-house to a point at or in close proximity to the southerly side of the channel about opposite the easterly side of the canal. From this it follows that the most direct and obviously proper course the launch could have taken from a point in mid-channel opposite the light-house to a point where it would have been most natural and convenient to turn out of the channel toward the south side of the creek in order to enter the canal was a course lying, not to the north nor to the south of the channel, but wholly within it. That this was the course held by the launch I am satisfied by the evidence, both direct and circumstantial, and this conclusion serves to explain several things which otherwise would be unexplained and inexplicable. That Blackwell, Jr., was anxious to get as directly as possible to the canal as a haven of safety there can be no question on the evidence, and had he felt any uncertainty of his ability to steer the proper course under the then conditions it would have been natural to consult Blackwell, Sr., who was on the launch and had been sailing the creek for the past twenty years. But he states he did not take orders from any one as to the steering and that he knew he was going for the canal. And his father says:

"I had every confidence in my son being able to steer the boat, because he had been doing it so much."

From a point several hundred feet to the east of the light-house the channel runs about west until at a distance approximately three hundred feet beyond the light-house it changes its course a number of degrees to the south of west and proceeds diagonally across the creek toward its southerly side and thence follows that side to a point a little beyond the canal. For about nine hundred or a thousand feet before reaching the easterly side of the canal the channel lies wholly in the southerly half of the creek and the distance between the southerly side of the channel and southerly side of the creek does not average more than slightly above a third of the distance between the northerly side of the channel and the northerly side of the creek. Blackwell, Jr., states that from a point in the channel about opposite the light-house he steered the launch with its tow towards the canal; that he had often been there and "I knew where the canal was, and that is where I was heading for out of the storm;" that he took orders from no one as to steering; that he knows about where the channel is and he followed it as nearly as he could; that from the point first mentioned he went over toward the southerly side and came up the creek; that all the way coming up he was in the southerly part of the channel; that his position down in the bow of the launch steering was such with respect to the canopy and curtains that he could see ahead or off on the side, but could not see behind or within the launch; that from the time he came diagonally across from the point mentioned he continued looking on the southerly side of the creek and partly

ahead; that notwithstanding the storm he could see the southerly side of the creek, but not the northerly; that he followed the channel before turning to go into the canal until he came to the point on the map marked "2," which according to the scale is about five hundred feet eastwardly from the easterly side of Lobdell's canal; that he did not see the steamboat after the launch entered the creek and the tow line was shortened until after he got into the canal. Blackwell, Sr., states that although he was within the curtains of the launch there was "a place in the middle about opposite where I was, where the two awnings join, and I looked out through that * * * sometimes, to see what I could see"; that he was running very close to the southerly side; that when the steamboat passed, the launch was very close to the Lobdell side in the channel; that he knows where the channel is, and to the best of his knowledge he was in it; and that the steamboat "out across the stern" of the launch about the point marked "2," which, as above stated, is about five hundred feet to the east of the canal. Mary M. Brennan states that as she was seated in the stern of the launch with the hind curtains up she saw the steamboat coming up; that it struck the row-boat "slanting ways"—"kinda of a glancing hit" on the port side; that the steamboat did not stop but proceeded on its course; that she was sitting in the launch looking toward the bow of the steamboat; and that they had been warned to watch out for her. Respondent's Exhibit D, 6/4/13, represents the steamboat in contact with the port side of the row-boat at an acute angle, as given by the witness. Pierce states, in substance, that the launch after passing the light-house proceeded toward the south shore of the creek; that in so proceeding the launch may have moved slightly from side to side but not enough for him to notice it from the stern; that the steamboat hit the row-boat on its left side; that the southerly side of the creek was visible, but not the northerly; that the launch was keeping a steady course; that this was apparent from looking at the shore; that the launch at the time of the collision was nearer to the southerly than the northerly side of the creek and at or about the point marked "8" or "2" on the map which, according to the scale, was at the distance of five hundred or six hundred feet below the easterly side of the canal; that the launch did not pull out to the north side; that the only time she pulled out was when she turned to go into the canal; and that the steamboat had "worried" those on the launch from the point "9" on the map all the way to the place of collision—that being a distance, according to the scale, of about six hundred and fifty feet. Myers states, in substance, that as the steamboat approached the launch he could see the southerly side of the creek; that the launch was then in the center of what he supposed was the channel; that the steamboat was going straight in the channel as he supposed; that it hit the row-boat on the port side "on a slant"—"a slight slant"; that the collision occurred at or about the point marked "2"; that the steamboat after the collision did not stop, but continued on her way; and that she hit the row-boat as the launch started to turn toward the canal. Under an adroit cross-examination, Myers, who was then twenty years old and had never testified before, was led manifestly as the re-

sult of a misunderstanding on his part, into an inconsistency of statement as to the angle at which the launch was proceeding to cross the channel and the bow of the steamboat. He had stated that the steamboat was coming "straight in the channel" as he supposed, and hit the row-boat "on a slight slant" on the port side; and that he did not think there was any danger of collision until the launch had commenced to turn to go into the canal. On cross-examination he was asked in leading questions whether from that point the launch was not "headed straight across the creek towards the canal" and so headed that "she was about at right angles" to the course of the steamboat, and to those inquiries the witness answered "Yes, sir." The phrase "at right angles" was not the language of Myers, but of the proctor for the respondent, and the former had no conception of its meaning. For on re-examination he states "we didn't go straight across," and to the question whether the steamboat did approach the launch and its tow at right angles failed to give any responsive answer. On re-cross-examination the same phrase "at right angles" to the course of the steamboat is again employed by the proctor for the respondent with the same result as in the original cross-examination. Finally, at the request of the proctor for the libelant Myers represented on paper (Libelant's Exhibit No. 6) the relative positions of the steamboat and row-boat at the moment of collision, showing the starboard bow of the steamboat in contact with the port side of the row-boat at an acute angle of from thirty to thirty-three degrees. That diagram is in conflict with the theory of the respondent but in accord with that of the libelant. Before the closing of the testimony Myers desired to correct his answers above specifically referred to, but was not permitted to do so, the commissioner holding that corrections should be promptly made. I do not deem this matter important as the diagram made by Myers is a sufficient correction of those answers.

Both direct and circumstantial evidence have satisfied me that the collision occurred in the southerly half of the channel approximately at the distance of five hundred feet below the easterly side of the canal. In the first place, an inspection of the map indicates that such point is the most convenient and natural at which the launch with its tow should direct its course directly to the canal. Owing to the bend in the channel to the right at that point the launch would proceed diagonally across its southerly portion and would have, after crossing the southerly side of the channel, ample depth of water for its passage to the canal, and not being in the northerly portion of the channel would be less liable to be run into by a steamboat ascending the creek. In the next place, there is direct and positive evidence above referred to that the collision did occur approximately at the above mentioned point. Thirdly, the row-boat was found aground on the southerly side of the creek at the distance of six hundred feet below the easterly side of the canal. High tide at the mouth of the creek on the evening of the collision was approximately at 5:50 p. m., and with the flood tide tending to carry the boat up the creek, and the strong wind blowing down and diagonally across the creek tending to carry it down, and with the small distance between the row-boat and the southerly shore, it is not an unnatural or improbable in-

ference that the boat may have drifted from the place of collision to the shore at a point about one hundred feet below.

The darkness that prevailed during the storm evidently has been exaggerated by some of the witnesses. The lights of the steamboat were burning, but Kane says: "We had the lights turned on so we could see our binnacle" and that the side lights have to be turned on "when we turn on the compass light." It was not dark enough to prevent the launch and her tow, 'although not lighted, from being seen from the steamboat in the midst of the storm at a distance of about five hundred feet. It is to be gathered from the testimony that the obscuration was not uniform from the beginning to the end of the storm, but varied from time to time. During the storm there was, according to the testimony of Quinn, enough light to enable him to see the railroad bridge at the distance of about half a mile.

Notwithstanding the shortening of the tow-line connecting the launch and the row-boat from twenty or twenty-five feet to twelve or fifteen feet, near the mouth of the creek, there was doubtless in the condition of wind and water considerable swinging or pulling from side to side. Myers, according to the weight of the evidence, must have referred to this lateral motion in stating that, while the steamboat was following the launch, sometimes the latter pulled out to the right and sometimes to the left. But this natural pulling or swinging under the strong cross-wind did not change the general course of the launch in the southerly portion of the channel; nor does Myers anywhere say that the launch with its tow at any time pulled out of the channel until the final turn to go into the canal. Kane with respect to the launch and her tow as they were proceeding up the creek says, on cross-examination, "They were all over the creek," and then contradicts himself by stating that before the launch came from the northerly side of the channel, as alleged, and crossed the bow of the steamboat to go into the canal, "I don't know that they crossed or re-crossed any at all. They were coming up the creek." The idea that the launch was zig-zagging from one side of the channel to the other is unsupported by the evidence and must be rejected. But should it be assumed that the launch and its tow were zig-zagging along the channel, there would be even more reason why the steamboat should have taken all precautionary steps to avoid a collision or entanglement. The evidence, direct and circumstantial, shows that the steamboat was coming up behind the launch and its tow until a few moments before the collision, and that the theory of the respondent as to the movements of the launch is untenable. If, as contended for the respondent, the launch made a sharp turn across the creek to the south approximately at right angles to the channel, crossing the bow of the steamboat, the latter would have been clearly visible and could not have escaped the attention of Blackwell, Jr., for notwithstanding his position down in the bow of the launch there was nothing to prevent him from seeing ahead or to either side; and the fact, if he is to be believed, that he did not see the steamboat until he reached the canal affords cogent evidence that the launch did not make the maneuver attributed to it by the respondent. It is also extremely improbable that Blackwell, Jr., if he had nothing to obstruct his view of the steamboat, would have re-

sorted to the perilous and foolhardy course attributed to him by the respondent. Further, owing to Blackwell's inability, by reason of the canopy and curtains, to see to the rear of the launch from his position in the bow steering, the fact that he did not see the steamboat affords equally cogent evident that she was coming up behind the launch. That she was so approaching the launch is in accord with the positive statement of the witnesses on the launch as to the direction of the steamboat's approach, and fully accounts for the failure of Blackwell, Jr., to see her after the shortening of the tow-line on entering the creek until she reached the canal.

The evidence as to the speed of the steamboat and of the launch with its tow, respectively, in moving up the channel after passing the lighthouse and until the collision is somewhat indefinite and unsatisfactory. On the testimony I have reached the conclusion that the speed of the former was about six miles an hour through the water, and of the launch with its tow about four miles an hour, or two-thirds of the speed of the steamboat. There are also circumstances in the case showing approximately the relative speed of the steamboat and the launch. As before stated, the distance in the channel from a point in its center opposite the light-house to the canal is twenty-six hundred feet, and when the steamboat reached a point where her bow was about her own length in advance of the light-house she first saw the launch with its tow directly ahead of her in the middle of the channel at the distance of about five hundred feet. The place of collision being in the channel about five hundred feet below the easterly side of the canal, and the bow of the steamboat when she first saw the launch being about two hundred feet above the light-house, the distance between her bow and the place of collision was about nineteen hundred feet. Assuming, in accordance with the preponderance of evidence, that the steamboat, subject to the brief slackening of speed presently to be mentioned, was moving and continued to move after leaving the light-house and until the collision, at the speed of about six miles an hour, and that the launch with its tow maintained a speed of about four miles, or two-thirds of that of the steamboat, it was necessary, other things being equal, that the latter should move about fifteen hundred feet before overtaking the launch. This would leave about four hundred of the nineteen hundred feet to be accounted for. That margin may readily be accounted for approximately, aside from any consideration of wind and tide and how far they neutralized each other in their effect upon the movement of the steamboat over the ground, by the slackening of her speed on or immediately before the giving of the danger signals, when about opposite or just above the light-house. At that time the engines of the steamboat were stopped, but not reversed, and remained stopped for about half a minute. This period is the lowest estimate by the witnesses and probably the closest approximation to the fact. The steamboat traveling at the rate of six miles an hour would in half a minute move two hundred and sixty-four feet. She, however, was not stopped, but continued passing through the water with diminishing speed until it was accelerated by the starting anew of the engines. If it be assumed,—and although speculative, it is not a violent assumption,—that the distance lost by

the steamboat from the time she stopped her engines until she regained her speed of about six miles an hour, was one-half of the distance made by her in about half a minute at her six mile rate, or approximately one hundred and thirty-two feet, it was necessary that the steamboat, if the launch was going about two-thirds as fast as the former, should move approximately four hundred feet to overtake the lead gained by the launch by reason of the stoppage of the steamboat's engines. If four hundred be added to the two hundred and the fifteen hundred feet the point at which the steamboat overtook the launch and its tow would be about twenty-one hundred feet from the center of the channel opposite the light-house and five hundred feet below the easterly side of the canal, and this accords with the direct and other circumstantial evidence that it was the place of collision. While results obtained from this calculation necessarily are inexact, they nevertheless serve to show that the ratio between the speed of the steamboat and that of the launch was approximately as three to two. If it had been substantially and widely different the collision could not have occurred where it did.

A number of witnesses on each side have testified to the presence or absence of marks on the row-boat on the evening of July 21, 1912, or thereafter, indicating that it had been in collision. Those for the libelant state that there were such marks on the port side and those for the respondent that there were not. For obvious reasons I do not attach any importance to this testimony. While the steamboat was moving approximately at the rate of six miles an hour the launch and her tow was moving about four miles and consequently the former relatively to the row-boat was moving at the rate of only about two miles an hour. Further, the evidence is that the steamboat did not come in contact with the row-boat at right angles, but only at an acute angle of not more than one-third of a right angle. Again, the evidence does not show that the glancing impact was between the steamboat's stem and the row-boat. On the contrary, it is to be inferred from the evidence that the steamboat's stem struck and broke the towline and the row-boat either under or aside from the tension of that line came in glancing contact with the starboard bow of the steamboat. Under these circumstances the absence of any pronounced marks of collision was but natural. The scraping or abrasion of the row-boat involved in the pushing, shoving or bumping contact would in all probability be similar to that produced by other objects with which it might have come in glancing contact while moving at the rate of two miles an hour. Hill, a witness for the respondent, who looked at the row-boat on the evening of the collision, in answer to the question, "Did you see any evidence at all of the boat having been struck by any other object, such as a boat?" said:

"I did not, any more than she was water worn. What I call water worn is where she had been butting up against wharves and things, and knocked the paint off her."

The evidence as to the appearance and condition of the row-boat cannot serve to answer the positive and circumstantial proofs of a collision, nor is it inconsistent with those proofs.

There is much testimony on the subject of blasts and whistles alleged to have been blown on the steamboat and the launch. While the witnesses on the steamboat state positively that blasts were given by that vessel, and also danger signals when the launch and her tow were first seen in the creek, those on the launch state they did not hear any. And so, while the witnesses on the launch state positively that it whistled frequently, those on the steamboat state they did not hear any such whistle. To give blasts, signals and whistles, under the existing conditions, was a natural and reasonable thing to do, and I am satisfied on the evidence that the steamboat and the launch blew blasts or whistles, but not wholly at the times or under the circumstances, stated by the witnesses; and further, that by reason of the noise of the storm, with its thunder, strong wind, and heavy and driving rain, such blasts and whistles, possibly with the exception of the single blast immediately before the collision, were not noticed by those for whom they were intended; the action of the wind and beating of the rain upon the canopy and curtains of the launch serving to deaden the blasts from the steamboat, and the comparatively small carrying power of the launch's whistle being insufficient to penetrate the storm and attract the notice of those on the steamboat. But in view of the fact that the launch saw the steamboat following it up the channel, and the steamboat knew where the launch and its tow were, the question of blasts and whistles is important only so far as they disclose the understanding and intention of those giving them. It appears from the testimony for the respondent that at some time after the first sighting of the launch and its tow and before the steamboat overtook them the steamboat gave a two-whistle signal and starboarded her wheel and swung from about the middle toward the southerly side of the channel, though to what extent she so swung and how long she continued moving in the southerly portion of the channel do not expressly appear. It may be assumed that the purpose of this maneuver was to avoid a collision, but the direct evidence is by no means clear on the question whether the two-whistle signal was given before or after the danger signals, or before or after the stoppage of the engines. Dolbow testifies as follows:

"Q. 67. When you made out this launch and tow what did you do? A. I gave the danger signal, four or five blasts of the whistle and stopped. Q. 68. And what then occurred? A. The little launch pulled out of the channel to one side, to the northward. * * * Q. 70. What was done then? A. I blew her two whistles and came ahead on my engines slowly and went on up stream. Q. 71. Your two whistles meant what? A. That I was to pass her on the port side and proceed up."

Kane testifies as follows:

"Q. 51. What then occurred on the City of Philadelphia? A. Captain Dolbow blew him two whistles and told me to starboard my wheel. Q. 52. Before blowing the two whistles were any other whistles blown by the City of Philadelphia? A. Danger signals. * * * Q. 54. With respect to the time when the lookout reported this boat? A. Just as soon as Charlie reported the boat, I judge the captain saw the boat at the same time he did, and he blew the whistles and stopped the engines and told me to starboard the wheel. Q. 55. Let me get this clear. The first thing that occurred was, you say, that the lookout reported a boat ahead? A. Yes, sir. Q. 56. And then

what was done on the City of Philadelphia? A. He blew the whistles. Q. 57. What whistles? A. He blew the danger signal, and then the two whistles. I was steering the boat and didn't blow the whistle. Q. 58. You were steering? What I want to get is the order in which these various things occurred. A. Yes. Q. 59. After the lookout reported the boat ahead what whistles, if any, were given by the City of Philadelphia? A. He blew him the two whistles and the danger signal. Q. 60. Did he blow the danger signal before blowing the two whistles or after? A. That I couldn't just say. It has been so long that I can't just remember how that was done. Q. 61. Then what occurred? You say he stopped the boat? A. He told me to starboard the wheel and he stopped the boat—stopped the engine. Of course, the boat had headway on, and, of course, he didn't back the engine, just at the present time. * * * Q. 66. Then you say that the captain blew two whistles and gave you an order to starboard the wheel? A. Yes, sir; to starboard my wheel. Q. 67. Did you do that? A. Yes, sir. * * * X. 138. And you don't remember whether the danger signal was given before the two-whistle signal or whether the two-whistle signal was given before the danger signal? A. I couldn't just say that."

It also appears from the testimony for the respondent that only a few moments before the steamboat passed by the stern of the launch the former ported her wheel and swung somewhat to starboard and that the purpose of this maneuver also was to avoid a collision; Dolbow, Brand, Quinn and Mangerbach all stating, in substance, that when the launch made her turn to go out of the channel and toward the canal, the steamboat gave one whistle, ported her wheel, swung to starboard and cleared the stern of the launch. It has, I believe, been shown by the strongest kind of circumstantial evidence as well as by direct and positive testimony, that the contention that the launch with its tow proceeded to the north of the northerly side of the channel and there becoming separated from the row-boat darted across the channel in front of the steamboat cannot be sustained. The launch and its tow after coming diagonally across from the point opposite the light-house were, on the evidence, not at any time before the collision to the north of the channel or on the northerly portion of it.

The evidence on both sides shows that from a point about opposite the light-house the steamboat in proceeding up the creek and until the collision followed the middle of the channel approximately, except so far as she departed from that course to a greater or less extent after the two-whistle signal, and also after the one-whistle signal. It appears from the map that the channel from a point about three hundred feet above the light-house runs in a straight course about eleven or twelve hundred feet diagonally toward the southerly side of the creek, the channel then changing its course to starboard about eighteen degrees, and continuing practically in a straight line about five hundred feet until it again changes to starboard to the extent of about twenty degrees; the point of collision being in the channel nearly opposite to the last mentioned change in the channel. It is evident, first, that while the steamboat was still proceeding along the straight course of eleven or twelve hundred feet approximately in the center of the channel, the launch with its tow must have reached and turned into the next course running about eighteen degrees to starboard of that then held by the steamboat, the necessary result being that until the steamboat reached the second course the launch would bear to a greater or

less extent on her starboard bow; secondly, that on account of the angle between those two courses the launch in pursuing the second would first open out on the starboard bow of the steamboat and then, as the latter neared the intersection of the two courses the bearing of the launch, though in fact making no turn to port, would progressively be more and more toward the bow of the steamboat, until the latter turned into the second course when the launch would be practically or perilously near to "dead ahead" of the steamboat; and thirdly, that in view of the ratio in speed between the steamboat and the launch when the former turned into the second course the launch with its tow must have been so close to the steamboat as to require prompt and careful action on the part of the latter to guard against collision. It is not claimed, nor is there any evidence, that the steamboat gave more than one two-whistle signal, and on the evidence there was no reason, either real or apparent, why she should give such a signal until on her near approach to the second course she perceived the bearing of the launch changing on her starboard bow. It is highly probable that at that point the steamboat gave her two-whistle signal, starboarded her wheel and swung into the southerly half of the channel and proceeded in it until the collision. But whether she did or did not at that time give a two-whistle signal she directed her course into the southerly half of the channel and without reducing her speed proceeded until the launch with its tow began to turn towards the canal when porting her helm too late she passed at an acute angle across the course of the launch and its tow, clearing the former but striking the latter. Indeed, Mangerbach, a witness for the respondent, says that when the launch started to turn the steamboat "might have been in mid-channel, or she might have been more to the south side of the channel." The attitude of those controlling the movements of the steamboat is strongly suggestive of the reckless, and, indeed, contemptuous disregard for life and property in small and comparatively frail craft so often displayed by those engaged in operation of larger and less vulnerable vessels. Quinn, the second officer, states with respect to the launch and its tow when distant five hundred feet, that there was danger "unless he got out of the way. * * * Yes, sir; unless he got out of the way." Mangerbach states that the steamboat stopped to give them "a chance to get out of the channel." Dolbow, the captain of the steamboat, states that:

"There was danger of us colliding with him, provided he stayed in the channel and we kept on proceeding as we were, as he was right ahead of us in the channel."

The channel was of abundant width to allow the passage of the steamboat and the launch with its tow abreast and this assumption of a right on the part of the steamboat as against the launch and its tow to monopolize the channel is wholly inadmissible and was, I think, largely instrumental in causing the catastrophe, which but for recklessness and carelessness on the part of the steamboat I think would not and could not have occurred. The launch with its tow was proceeding in the southerly half of the channel which, as before stated, was two hundred and fifty feet wide, and the steamboat was of only thirty-

two feet beam, and hence by proceeding on the starboard side of mid-channel would have had ample clearance of the launch and row-boat. Again, if those controlling the movements of the steamboat believed that she could not with undiminished speed pass the launch and her tow without a collision or otherwise imperiling life and property, she should have slackened her speed. The respondent has given no satisfactory answer to this point. It is true that Kane states it would not have been proper when the launch swung to port in order to enter the canal to "have stopped and reversed" the steamboat's engines, "because if we had, we would have been blown into the shore and blown into the launch." But this surmise is inadmissible for several reasons. No witness has said it would have been impracticable for the steamboat to slacken her speed. Again, as above stated, the launch had a canopy and side curtains and was towing a row-boat setting high out of the water, with only two men and a boy in it, and was moving only about two-thirds as fast as the steamboat; yet it does not appear that the launch with its tow had any difficulty in keeping off the shore. It seems to me on the face of the matter extremely improbable that the steamboat could not without peril of drifting ashore have slightly lessened its speed and thereby have avoided the collision. Further, the steamboat had when in the middle of the channel opposite or just above the light-house, on seeing the launch and her tow five hundred feet ahead, stopped her engines and not started them for about half a minute, without being carried over to the southerly side of the channel. The channel at the place of collision was just as wide as at the point where the steamboat stopped her engines, and to the south of the channel there was just as great a depth of water opposite the point of collision as opposite the point of stoppage. The difference between the compass course of the channel at the point of stoppage and at the point of collision was such that the wind blew more directly across the channel at the former than at the latter point. And when the steamboat stopped her engines the storm had burst in its violence and the wind was practically, if not equally, as strong as at the time of collision. Dolbow states: "It was blowing a gale from the mouth of the creek," and there was "very little lull until we reached above the railroad bridge." The steamboat was overtaking the launch and, as before stated, relatively to the latter was moving only at the rate of about two miles an hour. A very slight and practicable reduction in her speed, even after the launch had commenced to swing with its tow towards the mouth of the canal would have avoided the catastrophe. But on the undisputed evidence, having failed seasonably to direct her course into the northern portion of the channel she made no effort to effect such a reduction, but continued at her six mile rate with fatal results. There is evidence to the effect that those on the launch who were watching the approach of the steamboat in their rear were "worried" from the time she reached a point about six hundred and fifty feet from the place of collision. The steamboat was, I think, clearly at fault for not slackening her speed.

The steamboat, however, was not solely at fault. Gross carelessness and recklessness in the management of the launch also contributed to

the catastrophe. Blackwell, Sr., and his son, as well as other witnesses on the launch, knew that the steamboat was following them up the channel, and the first named had expressly cautioned those on the launch to look out for her. Yet Blackwell, Jr., the steersman, on his own showing, did not make any effort to gain a view of the channel to the rear of the launch before changing his course to port in order to reach the canal.

I do not find any contributory negligence on the part of the decedent, Contino. He and his companion, Velino, if they were not jarred or jolted from the row-boat into the water by the collision, jumped, as seems most probable, into the water in their excitement over an immediately impending collision and when matters were in extremis. The suggestion that the Italians on the near approach of the steamboat might have cut or untied the tow-line and cast themselves loose from the launch is without weight in view of the fact that the steamboat was gaining on them from behind. Such a step would have been the last to occur to the Italians or any reasonable persons situated as they were.

There is no evidence that the occupants of the row-boat or any of them had any control over the movements of the launch and the fault on the part of the launch was not committed through their procurement. Under these circumstances such fault was not imputable to them. Little v. Hackett, 116 U. S. 366, 6 Sup. Ct. 391, 29 L. Ed. 652; The Standard Oil Co. v. Anderson, 212 U. S. 215, 222, 29 Sup. Ct. 252, 53 L. Ed. 480; Quinette v. Bisso, 136 Fed. 825, 69 C. C. A. 503, 5 L. R. A. (N. S.) 303; Mayor, etc., of Baltimore v. State of Maryland, 166 Fed. 641, 92 C. C. A. 335; Kowalski v. Chicago G. W. Ry. Co. (C. C.) 84 Fed. 586; Trauffler v. Detroit & Cleveland Navigation Co. (D. C.) 181 Fed. 256; Monongahela River Consol. C. & C. Co. v. Schimerer, 196 Fed. 375, 117 C. C. A. 193.

Both the steamboat and the launch having been at fault there was a joint and several liability in personam on the part of their respective owners to respond in damages to the libelant which could be enforced in solido against either of them. The case must be referred to a commissioner to assess and report to the court with all convenient speed the amount of damages the libelant is entitled to recover; ascertaining such amount on the evidence heretofore taken in this cause and such supplementary evidence to be taken as shall be necessary for that purpose. Let a decree be prepared and submitted.